# TRAFFIX DEVICES, INC. *v.* MARKETING DISPLAYS, INC.

No. 99–1571. Argued November 29, 2000—Decided March 20, 2001

24

*John G. Roberts, Jr.*, argued the cause for petitioner. With him on the briefs were *Gregory G. Garre* and *Jeanne-Marie Marshall.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Ogden, Jeffrey A. Lamken, Anthony J. Steinmeyer,* and *Mark S. Davies.*

*John A. Artz* argued the cause for respondent. With him on the brief were *John S. Artz, Robert P. Renke,* and *Lisa A. Sarkisian.**

JUSTICE KENNEDY delivered the opinion of the Court.

Temporary road signs with warnings like "Road Work Ahead" or "Left Shoulder Closed" must withstand strong gusts of wind. An inventor named Robert Sarkisian obtained two utility patents for a mechanism built upon two springs (the dual-spring design) to keep these and other outdoor signs upright despite adverse wind conditions. The holder of the now-expired Sarkisian patents, respondent Marketing Displays, Inc. (MDI), established a successful business in the manufacture and sale of sign stands incorporating the patented feature. MDI's stands for road signs were recognizable to buyers and users (it says) because the dual-spring design was visible near the base of the sign.

---

*Briefs of *amici curiae* urging reversal were filed for the Holmes Group, Inc., by *James W. Dabney;* for Panduit Corp. by *Roy E. Hofer, Jerome Gilson, Cynthia A. Homan,* and *Philip A. Jones;* and for *Malla Pollack, pro se.*

Briefs of *amici curiae* urging affirmance were filed for the American Intellectual Property Association by *Louis T. Pirkey;* and for Thomas & Betts Corp. by *Sidney David* and *Roy H. Wepner.*

*Theodore H. Davis, Jr., Marie V. Driscoll,* and *Helen Hill Minsker* filed a brief for the International Trademark Association as *amicus curiae.*

This litigation followed after the patents expired and a competitor, TrafFix Devices, Inc., sold sign stands with a visible spring mechanism that looked like MDI's. MDI and TrafFix products looked alike because they were. When TrafFix started in business, it sent an MDI product abroad to have it reverse engineered, that is to say copied. Complicating matters, TrafFix marketed its sign stands under a name similar to MDI's. MDI used the name "WindMaster," while TrafFix, its new competitor, used "WindBuster."

MDI brought suit under the Trademark Act of 1946 (Lanham Act), 60 Stat. 427, as amended, 15 U. S. C. § 1051 *et seq.*, against TrafFix for trademark infringement (based on the similar names), trade dress infringement (based on the copied dual-spring design), and unfair competition. TrafFix counterclaimed on antitrust theories. After the United States District Court for the Eastern District of Michigan considered cross-motions for summary judgment, MDI prevailed on its trademark claim for the confusing similarity of names and was held not liable on the antitrust counterclaim; and those two rulings, affirmed by the Court of Appeals, are not before us.

I

We are concerned with the trade dress question. The District Court ruled against MDI on its trade dress claim. 971 F. Supp. 262 (ED Mich. 1997). After determining that the one element of MDI's trade dress at issue was the dual-spring design, *id.*, at 265, it held that "no reasonable trier of fact could determine that MDI has established secondary meaning" in its alleged trade dress, *id.*, at 269. In other words, consumers did not associate the look of the dual-spring design with MDI. As a second, independent reason to grant summary judgment in favor of TrafFix, the District Court determined the dual-spring design was functional. On this rationale secondary meaning is irrelevant because there can be no trade dress protection in any event. In ruling on the functional aspect of the design, the District Court

noted that Sixth Circuit precedent indicated that the burden was on MDI to prove that its trade dress was nonfunctional, and not on TrafFix to show that it was functional (a rule since adopted by Congress, see 15 U. S. C. § 1125(a)(3) (1994 ed., Supp. V)), and then went on to consider MDI's arguments that the dual-spring design was subject to trade dress protection. Finding none of MDI's contentions persuasive, the District Court concluded MDI had not "proffered sufficient evidence which would enable a reasonable trier of fact to find that MDI's vertical dual-spring design is *non-functional*." 971 F. Supp., at 276. Summary judgment was entered against MDI on its trade dress claims.

The Court of Appeals for the Sixth Circuit reversed the trade dress ruling. 200 F. 3d 929 (1999). The Court of Appeals held the District Court had erred in ruling MDI failed to show a genuine issue of material fact regarding whether it had secondary meaning in its alleged trade dress, *id.*, at 938, and had erred further in determining that MDI could not prevail in any event because the alleged trade dress was in fact a functional product configuration, *id.*, at 940. The Court of Appeals suggested the District Court committed legal error by looking only to the dual-spring design when evaluating MDI's trade dress. Basic to its reasoning was the Court of Appeals' observation that it took "little imagination to conceive of a hidden dual-spring mechanism or a tri or quad-spring mechanism that might avoid infringing [MDI's] trade dress." *Ibid.* The Court of Appeals explained that "[i]f TrafFix or another competitor chooses to use [MDI's] dual-spring design, then it will have to find *some other way* to set its sign apart to avoid infringing [MDI's] trade dress." *Ibid.* It was not sufficient, according to the Court of Appeals, that allowing exclusive use of a particular feature such as the dual-spring design in the guise of trade dress would "hinde[r] competition somewhat." Rather, "[e]xclusive use of a feature must 'put competitors at a *significant* non-reputation-related disadvantage' before trade

dress protection is denied on functionality grounds." *Ibid.* (quoting *Qualitex Co.* v. *Jacobson Products Co.*, 514 U. S. 159, 165 (1995)). In its criticism of the District Court's ruling on the trade dress question, the Court of Appeals took note of a split among Courts of Appeals in various other Circuits on the issue whether the existence of an expired utility patent forecloses the possibility of the patentee's claiming trade dress protection in the product's design. 200 F. 3d, at 939. Compare *Sunbeam Products, Inc.* v. *West Bend Co.*, 123 F. 3d 246 (CA5 1997) (holding that trade dress protection is not foreclosed), *Thomas & Betts Corp.* v. *Panduit Corp.*, 138 F. 3d 277 (CA7 1998) (same), and *Midwest Industries, Inc.* v. *Karavan Trailers, Inc.*, 175 F. 3d 1356 (CA Fed 1999) (same), with *Vornado Air Circulation Systems, Inc.* v. *Duracraft Corp.*, 58 F. 3d 1498, 1500 (CA10 1995) ("Where a product configuration is a significant inventive component of an invention covered by a utility patent . . . it cannot receive trade dress protection"). To resolve the conflict, we granted certiorari. 530 U. S. 1260 (2000).

## II

It is well established that trade dress can be protected under federal law. The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods. In these respects protection for trade dress exists to promote competition. As we explained just last Term, see *Wal-Mart Stores, Inc.* v. *Samara Brothers, Inc.*, 529 U. S. 205 (2000), various Courts of Appeals have allowed claims of trade dress infringement relying on the general provision of the Lanham Act which provides a cause of action to one who is injured when a person uses "any word, term name, symbol, or device, or any

combination thereof ... which is likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods." 15 U. S. C. § 1125(a)(1)(A). Congress confirmed this statutory protection for trade dress by amending the Lanham Act to recognize the concept. Title 15 U. S. C. § 1125(a)(3) (1994 ed., Supp. V) provides: "In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional." This burden of proof gives force to the well-established rule that trade dress protection may not be claimed for product features that are functional. *Qualitex, supra,* at 164–165; *Two Pesos, Inc.* v. *Taco Cabana, Inc.,* 505 U. S. 763, 775 (1992). And in *Wal-Mart, supra,* we were careful to caution against misuse or overextension of trade dress. We noted that "product design almost invariably serves purposes other than source identification." *Id.,* at 213.

Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying. As the Court has explained, copying is not always discouraged or disfavored by the laws which preserve our competitive economy. *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.,* 489 U. S. 141, 160 (1989). Allowing competitors to copy will have salutary effects in many instances. "Reverse engineering of chemical and mechanical articles in the public domain often leads to significant advances in technology." *Ibid.*

The principal question in this case is the effect of an expired patent on a claim of trade dress infringement. A prior patent, we conclude, has vital significance in resolving the trade dress claim. A utility patent is strong evidence that the features therein claimed are functional. If trade dress protection is sought for those features the strong evidence

of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection. Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device.

In the case before us, the central advance claimed in the expired utility patents (the Sarkisian patents) is the dual-spring design; and the dual-spring design is the essential feature of the trade dress MDI now seeks to establish and to protect. The rule we have explained bars the trade dress claim, for MDI did not, and cannot, carry the burden of overcoming the strong evidentiary inference of functionality based on the disclosure of the dual-spring design in the claims of the expired patents.

The dual springs shown in the Sarkisian patents were well apart (at either end of a frame for holding a rectangular sign when one full side is the base) while the dual springs at issue here are close together (in a frame designed to hold a sign by one of its corners). As the District Court recognized, this makes little difference. The point is that the springs are necessary to the operation of the device. The fact that the springs in this very different-looking device fall within the claims of the patents is illustrated by MDI's own position in earlier litigation. In the late 1970's, MDI engaged in a long-running intellectual property battle with a company known as Winn-Proof. Although the precise claims of the Sarkisian patents cover sign stands with springs "spaced apart," U. S. Patent No. 3,646,696, col. 4; U. S. Patent No. 3,662,482, col. 4, the Winn-Proof sign stands (with springs much like the sign stands at issue here) were found to infringe the patents by the United States District Court for the District of Oregon, and the Court of Appeals for the

Ninth Circuit affirmed the judgment. *Sarkisian* v. *Winn-Proof Corp.*, 697 F. 2d 1313 (1983). Although the Winn-Proof traffic sign stand (with dual springs close together) did not appear, then, to infringe the literal terms of the patent claims (which called for "spaced apart" springs), the Winn-Proof sign stand was found to infringe the patents under the doctrine of equivalents, which allows a finding of patent infringement even when the accused product does not fall within the literal terms of the claims. *Id.*, at 1321–1322; see generally *Warner-Jenkinson Co.* v. *Hilton Davis Chemical Co.*, 520 U. S. 17 (1997). In light of this past ruling—a ruling procured at MDI's own insistence—it must be concluded the products here at issue would have been covered by the claims of the expired patents.

The rationale for the rule that the disclosure of a feature in the claims of a utility patent constitutes strong evidence of functionality is well illustrated in this case. The dual-spring design serves the important purpose of keeping the sign upright even in heavy wind conditions; and, as confirmed by the statements in the expired patents, it does so in a unique and useful manner. As the specification of one of the patents recites, prior art "devices, in practice, will topple under the force of a strong wind." U. S. Patent No. 3,662,482, col. 1. The dual-spring design allows sign stands to resist toppling in strong winds. Using a dual-spring design rather than a single spring achieves important operational advantages. For example, the specifications of the patents note that the "use of a pair of springs . . . as opposed to the use of a single spring to support the frame structure prevents canting or twisting of the sign around a vertical axis," and that, if not prevented, twisting "may cause damage to the spring structure and may result in tipping of the device." U. S. Patent No. 3,646,696, col. 3. In the course of patent prosecution, it was said that "[t]he use of a pair of spring connections as opposed to a single spring connection . . . forms an important part of this combination" because it

"forc[es] the sign frame to tip along the longitudinal axis of the elongated ground-engaging members." App. 218. The dual-spring design affects the cost of the device as well; it was acknowledged that the device "could use three springs but this would unnecessarily increase the cost of the device." *Id.*, at 217. These statements made in the patent applications and in the course of procuring the patents demonstrate the functionality of the design. MDI does not assert that any of these representations are mistaken or inaccurate, and this is further strong evidence of the functionality of the dual-spring design.

### III

In finding for MDI on the trade dress issue the Court of Appeals gave insufficient recognition to the importance of the expired utility patents, and their evidentiary significance, in establishing the functionality of the device. The error likely was caused by its misinterpretation of trade dress principles in other respects. As we have noted, even if there has been no previous utility patent the party asserting trade dress has the burden to establish the nonfunctionality of alleged trade dress features. MDI could not meet this burden. Discussing trademarks, we have said "'[i]n general terms, a product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *Qualitex*, 514 U. S., at 165 (quoting *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S. 844, 850, n. 10 (1982)). Expanding upon the meaning of this phrase, we have observed that a functional feature is one the "exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." 514 U. S., at 165. The Court of Appeals in the instant case seemed to interpret this language to mean that a necessary test for functionality is "whether the particular product configuration is a competitive necessity." 200 F. 3d, at 940. See also *Vornado*, 58 F. 3d, at 1507 ("Functionality, by contrast, has been defined

both by our circuit, and more recently by the Supreme Court, in terms of competitive need"). This was incorrect as a comprehensive definition. As explained in *Qualitex, supra,* and *Inwood, supra,* a feature is also functional when it is essential to the use or purpose of the device or when it affects the cost or quality of the device. The *Qualitex* decision did not purport to displace this traditional rule. Instead, it quoted the rule as *Inwood* had set it forth. It is proper to inquire into a "significant non-reputation-related disadvantage" in cases of esthetic functionality, the question involved in *Qualitex*. Where the design is functional under the *Inwood* formulation there is no need to proceed further to consider if there is a competitive necessity for the feature. In *Qualitex,* by contrast, esthetic functionality was the central question, there having been no indication that the green-gold color of the laundry press pad had any bearing on the use or purpose of the product or its cost or quality.

The Court has allowed trade dress protection to certain product features that are inherently distinctive. *Two Pesos,* 505 U. S., at 774. In *Two Pesos,* however, the Court at the outset made the explicit analytic assumption that the trade dress features in question (decorations and other features to evoke a Mexican theme in a restaurant) were not functional. *Id.,* at 767, n. 6. The trade dress in those cases did not bar competitors from copying functional product design features. In the instant case, beyond serving the purpose of informing consumers that the sign stands are made by MDI (assuming it does so), the dual-spring design provides a unique and useful mechanism to resist the force of the wind. Functionality having been established, whether MDI's dual-spring design has acquired secondary meaning need not be considered.

There is no need, furthermore, to engage, as did the Court of Appeals, in speculation about other design possibilities, such as using three or four springs which might serve the same purpose. 200 F. 3d, at 940. Here, the functionality of the spring design means that competitors need not explore

whether other spring juxtapositions might be used. The dual-spring design is not an arbitrary flourish in the configuration of MDI's product; it is the reason the device works. Other designs need not be attempted.

Because the dual-spring design is functional, it is unnecessary for competitors to explore designs to hide the springs, say, by using a box or framework to cover them, as suggested by the Court of Appeals. *Ibid.* The dual-spring design assures the user the device will work. If buyers are assured the product serves its purpose by seeing the operative mechanism that in itself serves an important market need. It would be at cross-purposes to those objectives, and something of a paradox, were we to require the manufacturer to conceal the very item the user seeks.

In a case where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims, such as arbitrary curves in the legs or an ornamental pattern painted on the springs, a different result might obtain. There the manufacturer could perhaps prove that those aspects do not serve a purpose within the terms of the utility patent. The inquiry into whether such features, asserted to be trade dress, are functional by reason of their inclusion in the claims of an expired utility patent could be aided by going beyond the claims and examining the patent and its prosecution history to see if the feature in question is shown as a useful part of the invention. No such claim is made here, however. MDI in essence seeks protection for the dual-spring design alone. The asserted trade dress consists simply of the dual-spring design, four legs, a base, an upright, and a sign. MDI has pointed to nothing arbitrary about the components of its device or the way they are assembled. The Lanham Act does not exist to reward manufacturers for their innovation in creating a particular device; that is the purpose of the patent law and its period of exclusivity. The Lanham Act, furthermore, does not protect trade dress in a functional design simply

because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller. The Court of Appeals erred in viewing MDI as possessing the right to exclude competitors from using a design identical to MDI's and to require those competitors to adopt a different design simply to avoid copying it. MDI cannot gain the exclusive right to produce sign stands using the dual-spring design by asserting that consumers associate it with the look of the invention itself. Whether a utility patent has expired or there has been no utility patent at all, a product design which has a particular appearance may be functional because it is "essential to the use or purpose of the article" or "affects the cost or quality of the article." *Inwood*, 456 U. S., at 850, n. 10.

TrafFix and some of its *amici* argue that the Patent Clause of the Constitution, Art. I, §8, cl. 8, of its own force, prohibits the holder of an expired utility patent from claiming trade dress protection. Brief for Petitioner 33–36; Brief for Panduit Corp. as *Amicus Curiae* 3; Brief for Malla Pollack as *Amicus Curiae* 2. We need not resolve this question. If, despite the rule that functional features may not be the subject of trade dress protection, a case arises in which trade dress becomes the practical equivalent of an expired utility patent, that will be time enough to consider the matter. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*