**PILOT CORPORATION OF AMERICA, Plaintiff,**

v.

**FISHER–PRICE, INC. and Mattel, Inc., Defendants.**

**No. CIV.A. 3:04CV977(SRU).**

United States District Court, D. Connecticut.

Nov. 9, 2004.

---

Gregory J. Battersby, Edmund J. Ferdinand, III, Richard E. MacLean, Russell D. Dize (on the papers), Jessica Elliott (on the papers), Grimes & Battersby, LLP, Norwalk, CT, for Plaintiff Pilot Corporation of America.

Edward T. Colbert, Jonathan Reichman, William M. Merone, Susan A. Smith, Clyde E. Findley (on the papers), Kenyon & Kenyon, Washington, DC, Jacqueline D. Bucar, Timothy P. Jensen, Benjamin Solnit (on the papers), Tyler, Cooper & Alcorn, LLP, New Haven, CT, for Defendants Fisher-Price and Mattel.

### RULING ON MOTION FOR PRELIMINARY INJUNCTION

UNDERHILL, District Judge.

The Pilot Corporation of America ("PCA") seeks to enjoin Fisher–Price, Inc. and Mattel, Inc. (collectively "Fisher–Price") from selling a product that PCA believes infringes its federally registered trademark and its common-law "trade dress" rights. Because PCA has not shown it is likely to succeed on the merits of its claim, its motion is denied.

### I. Facts

The following facts are either undisputed or likely to be established by PCA at trial.

#### A. *The Magna Doodle*

Until recently, Fisher–Price sold a children's drawing toy named "the Magna Doodle." The Magna Doodle consists pri-

marily of a drawing screen made up of a lattice of small hexagons, each hexagon containing iron filings in suspension. The fluid in which the filings are suspended is opaque, and is viscous enough to hold the filings in place against gravitational force, but not viscous enough to hold them in place against magnetic force. When the Magna Doodle's "stylus"—a plastic rod tipped with a magnet—is drawn across the reticulated screen, the nearby filings are pulled to the top of the opaque suspension and become visible on the screen. The screen's lattice structure ensures an even distribution of filings. The Magna Doodle also has an "eraser bar," which sweeps a magnetic rod across the back of the screen, bringing all filings to the bottom of the suspended fluid, effectively "cleaning" the board.

## B. *The Agreement*

PCA owns U.S. Patent No. 4,143,472 ("the '472 patent"), entitled "Displaying Magnetic Panel and its Display Device," which covers the drawing screen used in the Magna Doodle. PCA also owns the federally registered trademark "Magna Doodle."

Since 1978, Magna Doodle products have been available on the market, though the mark was not always owned by PCA, and the product itself has not always been manufactured by Fisher–Price. Details of those earlier licensing arrangements are not relevant.

On January 1, 1992, PCA entered into a licensing agreement ("the Agreement") with Tyco, giving Tyco the exclusive right to use the Magna Doodle trademark in connection with the manufacture and sale of drawing toys covered by the '472 patent. In return, Tyco agreed to purchase from PCA 100% of its annual requirement of panels for incorporation into its drawing toys bearing the Magna Doodle mark.

The Agreement required the parties to agree by October 15 of each year on the number and price of panels to be supplied. Failure to do so would result in the Agreement terminating at the end of the calendar year. If the Agreement terminated, Tyco was permitted to continue to sell its existing inventory of licensed products for 180 days after the termination date.

The Agreement also provided that Tyco could use the Magna Doodle mark only in a manner approved by PCA.

In 1994 the parties amended the Agreement. The pertinent parts of the amendment stated:

WHEREAS, PCA and Tyco wish to amend the definition of the licensed "mark" to include those trademarks used by Tyco in connection with line extensions for the "MAGNA DOODLE" product on behalf of PCA .... "Mark" will mean the trademarks "MAGNA DOODLE", "MAGGIE DOODLE", "MAGNA DOODLE DAN", "THE ART OF IMAGINATION" or any other trademarks which may subsequently be used by Tyco in connection with the marketing and sale of goods in the "MAGNA DOODLE" line pursuant to license from PCA ....

## C. *Introduction of the Doodle Pro*

In 1997, Mattel merged with Tyco, and Mattel's subsidiary, Fisher–Price, assumed the rights and obligations of the 1992 Agreement as amended. Soon after the merger, Fisher–Price complained to PCA about the price of the panels used in the Magna Doodle. As a result, in 2000 and 2002, PCA lowered the price on the panels it sold to Fisher–Price. These price reductions did not satisfy Fisher–Price, and, in 2003 Fisher–Price informed PCA that if it did not lower its prices again, Fisher–Price would terminate the Agreement. PCA did not lower its prices, and Fisher–

Price did not place an order for panels before October 15, 2003. Accordingly, the Agreement terminated on December 31, 2003.

Under the terms of the Agreement, Fisher–Price was allowed to sell off its existing supply of Magna Doodles until 180 days after January 1, 2004, which it did. At the same time, however, Fisher–Price began to develop and market a replacement product, using panels purchased from a third-party vendor. The new product is named the "Doodle Pro." [1] The new product and all its packaging is nearly identical to the last version of the Magna Doodle sold by Fisher–Price. The only significant differences between the two products are their logos. The Magna Doodle product bore the label "Magna Doodle" in stylized purple script. The words "The Original" appeared in a red oval above the name, and the slogan "The world's favorite way to doodle!" appeared below. Additionally, the Magna Doodle packaging had a red banner bearing the word "Classic" running along the bottom of the package's face. The Doodle Pro product bears the label "Doodle Pro," also in stylized purple script, though not in the same font. None of the additional markings appear on the Doodle Pro package.

On May 5, 2004, PCA licensed its Magna Doodle trademark to The Ohio Art Company ("Ohio Art"). Though there is no Ohio Art Magna Doodle currently on the market, Ohio Art plans to introduce one. The prototype packages for this product bear the same logo as the last Fisher–Price Magna Doodle, including the words "The Original" and the slogan, "The world's favorite way to doodle!" The Ohio Art package's other elements differ from Fisher–Price's.

### D. Consumer Studies

Both parties commissioned surveys to gauge potential consumer confusion between the Magna Doodle and Doodle Pro marks. PCA conducted one survey, Fisher Price, two.

### 1. PCA's Survey—The Ostberg Survey

PCA's expert, Dr. Henry D. Ostberg, conducted a survey to determine the likelihood of confusion between the Magna Doodle and Doodle Pro logos. He surveyed 232 people who were potential purchasers of a toy for writing and drawing on an erasable board. These survey respondents were first shown a series of five toy logos, accompanied by a brief description of what kind of toy the logo would mark. The five logos, with their toy descriptions, were:

| Logo | Toy Description |
| --- | --- |
| Hot Wheels | authentic-looking toy cars |
| Mega Bloks | building blocks |
| Fab Friends | character doll with a flair for fashion |
| Boggle Jr. | spelling and reading game |
| Magna Doodle | erasable writing/drawing toy |

The Magna Doodle logo shown to the respondents consisted of the purple stylized writing on a yellow background. The logo appeared alone on a sheet of paper, not on a package, and without the words "The Original" or the slogan "The world's favorite way to doodle!"

The respondents were then asked a series of "buffer" questions, after which they were shown another series of five logos and descriptions. The series contained:

---

1. Fisher–Price is seeking, but has not yet received, federal registration of the "Doodle Pro" mark.

| Logo | Toy Description |
|------|----------------|
| Street Rockets | authentic-looking toy cars |
| Lego | building blocks |
| Fab Friends | character doll with a flair for fashion |
| Boggle Jr. | spelling and reading game |
| Doodle Pro | erasable writing/drawing toy |

The kinds of toys shown in this series were the same as in the first, i.e., they had the same descriptions. Two of the toys were actually the same (Fab Friends and Boggle Jr.).

After showing a respondent the second series, the interviewer would then point to the Doodle Pro logo and ask "Was this—with the same brand name—included in the first portfolio you saw before?" Respondents who answered "no" were then asked "Do you think that the company that puts out this product (i.e., Doodle Pro) also puts out or makes any of the products which were included in the first portfolio?" If respondents answered "yes," they were asked to say which product and why. Finally, respondents were asked "Do you think that this product received—or needed to receive—permission or approval from anyone for it to be made or sold?" If respondents answered "yes," they were asked from whom was permission needed and why they believed permission was needed.

Respondents were then asked the same set of questions but about the "Street Rockets" toys. This question was meant to work as an "internal control"—a means of determining what percentage of people may have been biased by the way that, or even just that fact that, questions were asked.

After bias was accounted for,[2] 22% of respondents believed Doodle Pro and Magna Doodle were the same brand. An additional 9% thought that Doodle Pro was either made by the same company or had received permission or approval from the same company that made Magna Doodle.

### 2. Fisher–Prices's First Survey—The Reitter Survey

Fisher–Price's first expert, Robert N. Reitter, conducted a survey to determine the likelihood of confusion between the Fisher–Price Doodle Pro product and the Ohio Art Magna Doodle Product. Reitter selected 160 respondents who were likely to buy a drawing toy for a child between the ages of two and six.

Each respondent was shown a prototype Ohio Art Magna Doodle and asked to examine it. After they finished, the toy was taken away and the respondent was asked a series of buffer questions. The respondent was then taken into a room containing nine products on display. Eight of the products were always the same—drawing toys made by competitors, namely:

Aquadoodle

Color 'n Drive

Crayola Trace 'n Draw Explorer

Dora the Explorer Adventure Doodler

Lazer Doodle

Lite Brite

Etch a Sketch

Super Draw

For half the respondents, the display also included the Doodle Pro product. For the other half, the display included a control product. The control product was a product identical in all respects to the Doodle Pro except its name was "Draw Pro" and

---

**2.** Bias was accounted for by subtracting the percentage of affirmative answers to the "Street Rockets" questions from the percentage of affirmative answers to the Magna Doodle questions.

its logo consisted of that name written in red upright text.

After the respondents viewed the products, they were asked if they thought any of the products in the display was made by the same company as the toy they saw earlier (i.e., the Magna Doodle). If they answered "yes," they were asked to identify which toy was put out by the same company.

Respondents were then asked if they thought any of the companies manufacturing the toys in the display were affiliated with, or got approval from, the company that made the toy they saw earlier. If they answered "yes," they were asked to identify which toy that company made.

In response to one of these questions, 31% of respondents answered "yes" and identified the Doodle Pro; 34% answered "yes" and identified the Draw Pro. Additionally, 29% of respondents in the group that saw the Doodle Pro answered "yes" and identified the Aquadoodle in response to one of the above questions, as did 30% of those in the group that saw the Draw Pro.

### 3. Fisher–Price's Second Survey—The Mazis Survey

Fisher–Price's second expert, Dr. Michael B. Maziz, conducted a survey to determine if consumers associated the Doodle Pro product with the Magna Doodle name, and, if so, whether that was due to the Doodle Pro logo or something else. Respondents were approximately 400 people who were likely to purchase a drawing toy for a child between the ages of two and six.

Respondents were shown an array of nine toys. The array was the same as the array used in the previous study. Half the respondents saw eight toys plus the Doodle Pro. The other half saw the same eight toys plus the Draw Pro. Respondents were then handed either the Doodle Pro or Draw Pro, depending on which group they were in, and asked the following questions:

1. Who do you think is the company that makes this toy? What makes you think so?

2. Do you or don't you think that the company that makes or puts out this toy also makes or puts out any other toy or toys on which a child can create pictures or designs, or have you no thoughts about this?

3. [If a respondent indicated the company did make other toys:] What toy or toys on which a child can create pictures or designs do you think are made or put out by the same company that makes or puts out this toy? Any others? Why do you think that the company that [makes the toy named] is made or put out by the same company?

4. Do you or don't you think that the company that makes or puts out this toy is somehow connected with or needed the approval of any other company or have you no thoughts about this?

5. [If a respondent indicated the company was connected or did need approval:] With what company or companies do you think it is connected with or needed the approval of? Any others? Why do you think that it is connected with or needed the approval of [the company named]?

The interviewer then handed the respondent the Super Draw and Dora the Explorer Adventure Doodler along with the Doodle Pro or Draw Pro, and asked:

These three toys are sometimes referred to as magnetic drawing boards. Other than these three toys, please tell me the names of any other magnetic drawing

boards you have heard about or seen before? Any others?

Almost all respondents answered that Fisher Price made either the Doodle Pro or Draw Pro. In each group, 60% of the respondents answered that the company that made Doodle Pro or Draw Pro made other products; 7.2% of those who saw the Doodle Pro identified Magna Doodle as the other product, as did 8.2% of the respondents who saw Draw Pro. Thirteen percent of Doodle Pro respondents, and 9.2% of Draw Pro respondents, indicated that the company that made the product they were shown (either Doodle Pro or Draw Pro) was connected with or needed approval of another company. Two Doodle Pro respondents identified that company as the company that made Magna Doodle, as did one Draw Pro respondent.

In response to the final question, 23.6% of respondents who saw the Doodle Pro mentioned Magna Doodle as another drawing toy, as did 29.5% of those who saw the Draw Pro.

## II. Discussion

There are two disputed issues in this case. First, the parties dispute the extent of PCA's trademark rights. PCA argues that it owns not only the name Magna Doodle and its logo but also all the trade dress associated with the packaging and marketing of the Magna Doodle, even that created by Fisher–Price. Fisher–Price denies that PCA has any rights in the trade dress. Second, the parties dispute whether Fisher–Price's Doodle Pro product infringes PCA's trademark rights.

### A. Standard of Review

■ The Second Circuit has adopted a two-prong test for determining when a preliminary injunction is appropriate. The burden is on the party seeking the injunction to demonstrate (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Reuters Ltd. v. United Press Intern., Inc.,* 903 F.2d 904, 907 (2d Cir.1990).

In this case, there is no need to deal with the first prong because PCA has not established either likelihood of success on the merits or a balance of hardships tipping decidedly in its favor.[3]

### B. Ownership of "Trade Dress"

■ PCA appears to have two theories concerning trade dress ownership.[4] First, it argues that the Magna Doodle product has always had a "consistent overall look," and PCA's license to Fisher–Price was a license of not only a name and logo but also that look, and therefore Fisher–Price cannot continue to use designs based on that look. Second, PCA argues, even if there is no "consistent overall look" to the Magna Doodle, the parties nevertheless agreed, either explicitly or implicitly, that all trade dress created by Fisher–Price for the Magna Doodle would be owned by PCA.

### 1. Pre–Fisher–Price Trade Dress

■ PCA argues that its license to Fisher–Price included not only the Magna

---

3. Fisher–Price argued that a higher burden should apply in this case because it believes the injunction PCA is seeking qualifies as a mandatory injunction. PCA has not met even the lower burden, so there is no need to reach the question.

4. Trade dress rights may be enforced under section 43(a) of the Lanham Act. 15 U.S.C. § 1125(a).

Doodle name and logo but also various trade dress elements that Fisher–Price eventually used in its designs. PCA contends that this trade dress consists of the "consistent overall look" that the Magna Doodle has had since its 1978 introduction.

 If, since its creation, the Magna Doodle had maintained a certain unique look and if PCA owned that look, it would certainly make sense that its license to Fisher–Price would have included the right to use that look and that Fisher–Price could not now continue to use that look in its future products. The problem is that the evidence presented to date does not support the existence of a "consistent overall look." The Magna Doodle's design and package have changed with nearly every iteration of the product; the only things that have remained consistent are the name, the logo, and certain functional elements.[5] Accordingly, on the present record, I cannot conclude that PCA owned trade dress rights in the overall look of the Magna Doodle at the time it licensed the Magna Doodle to PCA.

### 2. Trade Dress Created By Fisher–Price

PCA acknowledges that the contract between it and Fisher–Price is silent about who owns the rights to packaging and presentation, i.e., trade dress, created by Fisher–Price for the Magna Doodle products. PCA also admits that the designs for the Magna Doodle packaging were created by Fisher–Price at Fisher–Price's expense. Nevertheless, PCA believes it now owns the rights to that trade dress. It has three arguments: (1) the 1994 amendment to the Agreement explicitly assigned those

rights to PCA; (2) the parties' course of dealing—specifically, Fisher Price's seeking PCA approval for new designs—indicates PCA has ownership; and (3) it is standard industry practice for the licensor of a trademark to become the owner of all trade dress developed for use with the licensed mark.

### a. The Agreement

 PCA argues that the language in the 1994 amendment to the Agreement redefining the term "mark" to include "any other trademarks which may subsequently be used by [Fisher–Price] in connection with the marketing and sale of goods in the MAGNA DOODLE line," meant to assign ownership of trade dress rights to PCA. This interpretation is not tenable.

In the first place, it is not clear from the face of the contract that the term "trademark" was meant to cover trade dress. PCA's evidence in support of that conclusion is the after-the-fact testimony of PCA's representative. That evidence alone does not convince me that this was the likely meaning intended by the parties.

More fundamentally, PCA's argument begs the question. If the term "trademark" in the amendment refers to trade dress, all that would mean is that the amendment granted Fisher–Price a license for any Magna Doodle trade dress *actually owned by PCA*.[6] The question, however, is who owned what trade dress in the first place, and the amendment does not speak to that issue.

### b. Course of Dealing

 PCA next argues that, even if the contract language provides no insight into

---

**5.** Functional elements do not receive trade dress protection. *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001).

**6.** Moreover, as discussed above, PCA has not established that it owned any pre-Fisher-Price trade dress. This further weakens PCA's argument that the term "trademark" was intended to cover trade dress.

trade dress ownership, it is clear from the parties' course of dealing that they intended PCA to own the trade dress. Specifically, PCA argues that Fisher–Price submitted all package designs to PCA for approval, and that, in the licensing industry, this is understood to be an indication of the licensor's ownership. Assuming the statements about the licensing industry are true, the evidence still does not show that Fisher–Price submitted its designs to PCA for approval of the trade dress itself. Instead what the record indicates is that, in accordance with the terms of the Agreement, Fisher–Price would submit its potential designs to PCA so that PCA could satisfy itself that its Magna Doodle mark was appropriately displayed. There is simply no credible evidence in the current record that shows PCA had any creative input in or veto power over the design of Magna Doodle packaging.

### c. Industry Practice

PCA's final argument, made through its expert Carole Francesca, is that in the licensing industry trade dress is rarely mentioned in licenses, and it is always understood that rights in such trade dress will belong to the licensor. I am not persuaded by Ms. Francesca's testimony. I do accept her statement that many licensing contracts do not mention the word "trade dress," but not her inference that this is because in all cases it is understood that the licensor will own all trade dress. Rather it appears to me, based on the testimony of Fisher–Price's witnesses and on the testimony given by Ms. Francesca under cross-examination, that there are primarily two reasons why licensing contracts do not mention trade dress: (1) because the situation is one where the licensee is required to conform his use of the licensed property to very specific guidelines, and cannot, therefore, independently develop any trade dress, making the trade dress question irrelevant; or (2) because the trade dress question is in fact addressed by the contract, but through the use of words other than "trade dress." Of course, it may be that there are some contracts that, as Ms. Francesca suggested, do not mention the term trade dress, do not refer to it by another name, and yet intend that trade dress created by the licensee will be owned by the licensor. Still, even if some such contracts exist, I cannot conclude on that basis that the standard practice in the industry is to silently allow all trade dress rights—no matter who creates the trade dress—to belong to the licensor.

### 3. Summary

In short, because there is insufficient evidence that PCA owned trade dress rights before it licensed the Magna Doodle to Fisher–Price and because there is insufficient evidence that the parties intended for PCA to have ownership of trade dress rights created by Fisher Price, I conclude that PCA is not likely to succeed at trial in demonstrating that its rights include trade dress rights.[7]

### C. Likelihood of Confusion

■ Having concluded that PCA has not established trademark rights in any part of the packaging or design of the Magna Doodle, other than the name and logo, the question is whether Fisher–Price is infringing on that trademarked name and logo.

---

7. Even if PCA did establish its ownership to trade dress elements, it would be required to show that such elements had acquired secondary meaning in order to receive federal protection. *See TrafFix*, 532 U.S. at 28, 121 S.Ct. 1255. There is little evidence on this point.

PCA appears to have two theories of infringement. First, consumers will believe any product bearing the Doodle Pro logo is associated with Magna Doodle, regardless of whether the consumer knows the Magna Doodle's history. In other words, the mere presence of the logo causes confusion, not the peculiar history of the toy's licensing.[8] Second, when a new Magna Doodle product is released consumers will either assume Doodle Pro is made by the same company as that new Magna Doodle, or assume that the new Magna Doodle is made by the company making Doodle Pro, i.e., "reverse confusion."

PCA believes that the Ostberg Survey establishes both types of confusion. According to PCA, that study establishes that consumers cannot help but associate the Doodle Pro logo with the Magna Doodle logo. Therefore, PCA concludes, consumers will imagine both that the Doodle Pro is associated with the Magna Doodle mark generally and that it is associated with any specific Magna Doodle product that may be released.

I agree with Fisher–Price that there are at least three significant problems with the Ostberg Survey. First, consumers were never shown any products. Instead, the survey was designed to determine whether the two logos were, in the abstract, confusingly similar. That two logos may be confusing when viewed in isolation, does not show that their use on two separate products is also confusing. Second, the survey did not use the entire trademarked logo for the Magna Doodle. Dr. Ostberg left out two potentially distinguishing markers—the words "The Original" and the Magna Doodle slogan—even though those items have consistently been

present on the actual Magna Doodle products. Third, the survey's "internal control" seems inadequate. It does not account for the possibility that respondents could have relied on non-protected similarities such as similar colors. Both the Doodle Pro and Magna Doodle logos shown to respondents consisted of purple writing on a yellow background. No other logos used in the survey contained this color scheme, and no two other corresponding logos had the same color scheme as each other (unless it was simply the same logo shown twice).

In sum, the most I am able to glean from the Ostberg Survey is that consumers are more likely to confuse the name "Doodle Pro" written in purple on a yellow background with the name "Magna Doodle" similarly written than they are to confuse the name "Doodle Pro" so written with the names of other toys—or than they are to confuse the name "Street Rockets," written in yellow, black, and white on a blue background, with the name "Hot Wheels" written in yellow and white on a red background. The Ostberg Survey, however, does not lead me to believe that consumers are any more likely to confuse a Doodle Pro product with either the Magna Doodle name or a Magna Doodle product, than they are to confuse the Doodle Pro with any other drawing toy, or any other drawing toy with Magna Doodle.

Fisher–Price argues both that the Ostberg Survey is flawed and that Fisher–Price's surveys rebut PCA's conclusions. The Mazis Survey, according to Fisher–Price, establishes that consumers are no more likely to recall the Magna Doodle after seeing the Doodle Pro than they are after seeing the Draw Pro, indicating that,

8. Presumably PCA does not think that customers are being misled, if they believe there is an association between Fisher–Price and Magna Doodle solely because Fisher–Price used to make Magna Doodle.

if there is any association, it is not caused by the Doodle Pro name or logo. Similarly, Fisher–Price contends that the Reitter Survey establishes that consumers were no more likely to associate the Ohio Art Magna Doodle product with the Doodle Pro than with the Draw Pro, eliminating the possibility that any association was the result of the Doodle Pro logo. Fisher–Price does not claim that either study establishes that consumers will not associate the Doodle Pro with either the Magna Doodle mark or a Magna Doodle product. Fisher–Price argues only that such association is not the result of any impermissible marking, but is instead the result of something else—such as the similarity between the functionality of the products, their packaging, their design, or some other unprotected element.

I find the methodology of Fisher–Price's surveys more suited than PCA's to the question at hand. Both Fisher–Price surveys used a control drawing product—as opposed to a control consisting of some other toy. That control product was well designed to determine whether the difference between the control product and the tested product, viz., the logo, is the cause of any confusion. Both studies determined it is not. I do not mean to suggest there are no problems with these studies. As PCA points out, the Reitter Survey suffered from a small sample size,[9] and the

questions in the Mazis Survey were somewhat confusing.[10] Nevertheless, on the whole, as compared with the Ostberg Survey, I find the methodology of the Fisher–Price surveys more sound.

Having considered all this evidence,[11] I conclude that PCA has not demonstrated that it is likely to succeed in proving likelihood of confusion at trial. Though there are problems with both sides' expert reports, on the whole, I find Fisher–Price's surveys more persuasive. Moreover, the burden of proof is on PCA, and, even without the counter evidence of Fisher–Price's surveys, I do not think the Ostberg Study establishes likelihood of confusion.

### D. *Balance of Harms*

■ Because I analyzed PCA's evidence to determine "likelihood of success," I must consider the possibility that, even if that standard is not met, PCA may still have demonstrated sufficiently serious questions on the merits plus a balance of hardships tipping decidedly in its favor. Putting aside the question whether PCA has presented enough evidence to demonstrate "sufficiently serious questions" despite not showing "likelihood of success," I find that it has not shown a balance of hardships tipping decidedly in its favor.

I do not doubt that, if PCA is ultimately successful, it will have suffered harm.

9. Fisher–Price argues persuasively that small sample size only makes the results less precise, not wholly inaccurate, and that, because the results in this case showed *0%* confusion, even if that result is somewhat imprecise, it is still strong evidence of lack of confusion.

10. I do not, however, agree with all of PCA's criticisms of Fisher–Price's surveys. For example, I do not find convincing PCA's argument that the Reitter Survey was incomplete because it failed to ask consumers whether they thought the Magna Doodle and Doodle Pro products were *the same*, instead of just similar. Neither am I concerned because

Fisher–Price's surveys did not include, or did not evaluate the answers to, "why" questions.

11. There was a minimal amount of evidence presented on other *Polaroid* factors, including evidence concerning a few incidents of possible actual confusion and evidence concerning the strength of the Magna Doodle mark. Because the expert testimony on likelihood of confusion was by far the most significant evidence, I will not go through every item of the additional evidence. I merely note that I have considered all that evidence as well, and it does not alter my conclusion.

Fisher–Price is certainly a significant competitor, and I am sure PCA can ill afford to lose any chance at a competitive edge. Nevertheless, an injunction against Fisher–Price, particularly just before the holiday shopping season, could be devastating to the success of its new Doodle Pro product. Accordingly, on balance, I cannot say that the balance of hardships tips one way or the other; I certainly cannot say that it tips decidedly in PCA's favor.

The plaintiff's motion for preliminary injunction (doc. # 4) is DENIED.

It is so ordered.