19-2951
Sulzer Mixpac AG v. A&N Trading Co., et al.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2020

(Argued: November 13, 2020                    Decided: February 18, 2021)

Docket No. 19-2951

_____

SULZER MIXPAC AG,

*Plaintiff-Counter-Defendant-Appellee*,

v.

A&N TRADING COMPANY, A&N TRADING CO., LTD., and SUNG BIN AN,
AKA TONY AN,

*Defendants-Counter-Claimants-Appellants*.[1]

_____

Before: JACOBS, POOLER, and BIANCO, *Circuit Judges*.

Appeal from grant of final judgment of the United States District Court for

the Southern District of New York (Lewis A. Kaplan, *J.*) to Sulzer Mixpac AG on

---

[1] The Clerk of Court is directed to amend the caption as above.

its claims of unfair competition, infringement of common law trademarks, and its claims under the Trademark Act of 1946 (Lanham Act), 60 Stat. 427, as amended, 15 U.S.C. § 1051 *et seq.*, for trademark counterfeiting, infringement of registered marks, and false designation of origin. The district court held that Mixpac's trade dress—its use of yellow, teal, blue, pink, purple, brown, and white on mixing tips—is not functional. We disagree, and hold that the use of these colors on mixing tips is functional, as the colors signify diameter and enable users to match a cartridge to the appropriate mixing tip.

Therefore, we reverse and remand for entry of final judgment in favor of A&N Trading Company, A&N Trading Co., Ltd., and Sung Bin An on Sulzer Mixpac AG's unfair competition, trademark infringement, trademark counterfeiting, and false designation of origin claims. We decline to address A&N Trading Company, A&N Trading Co., Ltd., and Sung Bin An's counterclaims. We also decline to address in the first instance Sulzer Mixpac AG's civil contempt claim, which the district court did not reach.

Reversed and remanded.

_____

2

JOSHUA B. KATZ, Kent, Beatty & Gordon, LLP, (Jack A. Gordon, *on the brief*), New York, NY, *for Defendants-Counter-Claimants-Appellants A&N Trading Co., A&N Trading Co., Ltd. and Sung Bin An, aka Tony An.*

MICHAEL T. MURPHY, Global IP Counselors, LLP (Daniel Hwang, Suzanne E. Konrad, *on the brief*), Washington, DC, *for Plaintiff-Counter-Defendant-Appellee Sulzer Mixpac AG.*

Charles D. Cole, Jr., Newman Myers Kreines Harris, P.C. (*on the brief*), New York, NY, *for Plaintiff-Counter-Defendant-Appellee Sulzer Mixpac AG.*

POOLER, *Circuit Judge*:

If a product's trade dress is functional, there can be no trade dress protection. The functionality doctrine is at the core of the parties' dispute. Plaintiff-Counter-Defendant-Appellee Sulzer Mixpac AG ("Mixpac") and Defendants-Counter-Claimants-Appellants A&N Trading Company, A&N Trading Co., Ltd., and Sung Bin An, also known as Tony An (collectively, "A&N") are competitors in the U.S. market for mixing tips used by dentists to create impressions of teeth for dental procedures, such as crowns.

A&N appeals from a final judgment and permanent injunction entered in the United States District Court for the Southern District of New York (Lewis A. Kaplan, *J.*) on Mixpac's claims of unfair competition, common law trademark

3

infringement, and trademark infringement, trademark counterfeiting, and false designation of origin under the Trademark Act of 1946 (the "Lanham Act"), 60 Stat. 427, as amended, 15 U.S.C. § 1051 *et seq.*, and on A&N's counterclaims seeking a declaratory judgment that Mixpac's trade dress is functional. The district court entered judgment for Mixpac on these counts. A&N argues on appeal that Mixpac's use of particular colors on mixing tips is functional because the colors serve as a color-coding scheme that signifies the size of a mixing tip.

Following a one-day bench trial, the district court concluded that Mixpac's use of particular colors on mixing tips was not functional, as the colors add to manufacturing costs and other companies use different or no colors for their mixing tips. We disagree. The evidence establishes that the colors signify mixing tip sizes, enabling users to more easily match cartridges to the appropriate mixing tips. Therefore, we conclude that Mixpac's trade dress is functional. We reverse the judgment of the district court, and remand. We decline to address in the first instance A&N's argument that the district court should have dismissed Mixpac's contempt claim with prejudice.

# BACKGROUND

## I.    The Parties

Mixpac manufactures a system to mix adhesives for dental applications. The system consists of a dispenser-like caulking gun, a cartridge containing two cylinders, and a mixing tip. Mixpac manufactures all three parts of the system and is a leading supplier of mixing tips. A mixing tip is composed of a cylinder that contains helixes that blend components as they pass through the tip. The materials that are mixed come from a two-cylinder cartridge. The mixing tip is attached to the cartridge via the mixing tip's cap. The cartridge, in turn, is attached to the dispenser-like caulking gun. When the trigger of the caulking gun is pulled, the components inside the cartridge are pushed into the mixing tip for blending. To accommodate different types of dental procedures, mixing tips vary in their diameter, the length of the helixes that mix component materials, and cap sizes.

Mixpac's customers are primarily dental material manufacturers such as 3M ESPE and Dentsply that buy Mixpac cartridges, fill them with their own dental materials, and sell sets of filled cartridges and mixing tips to dental

distributors. The distributors, in turn, sell to dental professionals. Mixpac also sells mixing tips directly to dental distributors, such as Henry Schein.

A&N Trading Company is the predecessor company of A&N Trading Co., Ltd., a corporation of South Korea. A&N distributes mixing tips that are manufactured by Seil Global Co., Ltd. ("Seil Global"). Sung Bin An, also known as Tony An, is a citizen of South Korea. An is the president, sole owner, and only employee of A&N Trading Co., Ltd. An's mother is the president of Seil Global and his father is Seil Global's chief executive officer. An is a shareholder of Seil Global and has been a Seil Global employee since February 2016.

**II.    Mixpac's Trademark Registrations and A&N's Alleged Infringement**

Mixpac owns twelve U.S. trademark registrations for particular colors on mixing tips. On March 23, 2010, it obtained trademarks on the principal register for the use of yellow and teal on mixing tip caps. On June 14, 2011, it obtained trademarks on the principal register for the use of blue, pink, purple, and brown on mixing tip caps. In January 2015 and January 2016, it obtained registered marks on the principal register for these same colors as "applied to the lower portion of dental mixing tips." App'x at 884; *see also* App'x at 885-89. Mixpac also owns trademarks on the supplemental register for yellow, teal, blue, pink,

6

purple, and brown (collectively, the "Candy Colors") as applied to mixing tip cylinders and helixes, which it obtained in July and November of 2017.[2] App'x at 890-901.

The trademark registrations reflect that Mixpac used Candy Colors on mixing tip caps as early as December 1997, but only began to use Candy Colors on mixing tip cylinders and helixes in 2017. The only exception was blue, which Mixpac used on mixing tip cylinders and helixes as early as 2009.

Notwithstanding Mixpac's trademark registrations, A&N displayed and advertised mixing tips with clear caps and colored helixes during the 2016 Greater New York Dental Meeting ("2016 GNYDM"), held from November 27-30, 2016. The colors were identical or nearly identical to the colors on Mixpac's mixing tips. Tony An represented A&N at the 2016 GNYDM. Seil Global

---

[2] Registration on the principal register confers on the mark's holder certain benefits in litigation, including a rebuttable presumption that the mark is valid. *See* 15 U.S.C. § 1115(a). The supplemental register lists "non-mark designations . . . that are only 'capable' of someday becoming a 'mark' upon the acquisition of secondary meaning.' 3 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 19:33 (5th ed. 2020). Thus, registration on the supplemental register does not confer the same benefits as does registration on the principal register, *see* 15 U.S.C. § 1094; in fact, it "does nothing to enlarge the substantive rights of the registrant." *Clairol Inc. v. Gillette Co.*, 389 F.2d 264, 267 (2d Cir. 1968).

manufactured the mixing tips that A&N displayed and paid A&N's expenses for the 2016 GNYDM.

Seil Global and Mixpac already had a tumultuous history. In 2008, Mixpac sued Seil Global and five other dental products manufacturers and distributors in the U.S. District Court for the Southern District of New York, alleging trademark and trade dress infringement (the "2008 Litigation"). Seil Global defaulted. In 2009, the district court entered a default judgment in Mixpac's favor, followed by a permanent injunction against Seil Global, prohibiting it and "its principals, officers, members, agents, servants, employees, attorneys, and those persons under their control or in active concert or participation with them who receive actual notice" from "selling, offering for sale, distributing, or advertising any mixing tips that infringe The Colored Dome Mark and Mixpac Trade Dress" or from "assisting, aiding or abetting" any entity in doing so. Special App'x at 4-5. On May 28, 2013, the district court entered an order for civil contempt and sanctions against Seil Global after it failed to respond to multiple orders to show cause. The district court awarded $41,250 in damages and imposed a $20,000 fine, which remain unpaid. An became aware of the permanent injunction and civil contempt order no later than 2016.

## III. Proceedings in District Court

On November 28, 2016, as the 2016 GNYDM continued, Mixpac filed suit against A&N, alleging unfair competition, infringement of common law marks, and claims under the Lanham Act for trademark infringement under 15 U.S.C. §§ 1114 and 1125(a), trademark counterfeiting under 15 U.S.C. § 1114, and false designation of origin under 15 U.S.C. § 1125(a).[3] Mixpac also sought to hold A&N in civil contempt of the injunction entered in the 2008 Litigation. A&N counterclaimed, alleging that Mixpac's use of Candy Colors on mixing tips was functional and, therefore, its trademark registrations should be canceled. Mixpac filed a Supplemental Complaint on February 12, 2019 to plead new U.S. trademark registrations, namely the registrations on the supplemental register.

After a one-day bench trial held on May 9, 2019, the district court granted final judgment and a permanent injunction for Mixpac on its claims for unfair competition, false designation of origin, infringement, and counterfeiting. The district court did not reach the contempt claim and awarded Mixpac $2 million in statutory damages. Witnesses presented direct testimony through written

---

[3] Mixpac also sued A&N for violations of Sections 349, 350, and 360-1 of New York's General Business Law, which the parties stipulated to dismiss.

statements, followed by cross and redirect examinations. A&N called two witnesses: Tony An and Dr. George Cisneros, a Professor at the NYU College of Dentistry who testified as an expert. Mixpac called three witnesses: Paul Jutzi, Mixpac's Director of Technology and Innovation; Daniel Ferrari, Mixpac's Director of Market Segment Healthcare; and expert witness Dr. Howard S. Glazer, a dentist with a general dental practice in Fort Lee, New Jersey. Mixpac also introduced the posthumous direct testimony of expert witness Jacob Jacoby, Ph.D., who ran a consumer research firm.

The witnesses testified as to the Candy Colors' purpose. Jutzi testified that applying Candy Colors to the mixing tips "adds time and significant cost" and it "would be less expensive for Mixpac to make clear mixing tips without any color." App'x at 582. He testified that while "Mixpac makes mixing tips with different sizes and types in the same color, and also the same size in different colors . . . [it] provides cartridges and mixing tips that can be matched by the same color." App'x at 583. His testimony on cross-examination (considered together with other evidence in the record) acknowledges that all yellow mixing tips are 4.2 millimeters in diameter, all teal mixing tips are 6.5 millimeters in diameter, and all blue mixing tips are 3.2 millimeters in diameter. Ferrari

similarly testified on cross-examination that Mixpac's catalog identifies mixing tip diameters by color, where teal indicates 6.5 millimeters, pink indicates 5.4 millimeters, yellow indicates 4.2 millimeters, blue indicates 3.2 millimeters, and brown indicates 2.5 millimeters. Glazer testified that in dental practice he does "not use, or select, a replacement mixing tip based on [c]olor alone because each of the two-component materials used is unique." App'x at 383.

Additional evidence sheds light on the Candy Colors' purpose. In connection with the 2008 Litigation, Mixpac submitted declarations from its employees. In a declaration dated November 25, 2008, Richard J. Wilson, then Business Manager for Sulzer Mixpac USA, described that, "[t]o assist in identifying Mixpac's product and to enable users to quickly select a mixing tip that matches the proper cartridge, [Mixpac] chose a unique and arbitrary color coding system." App'x at 2622. Wilson further declared that the "colors of the cartridge cap are matched to the mixing tip to indicate the proper size and mixing ratio for the dental materials." App'x at 2623. Armin Hegglin, then Area Sales Manager U.S. for Mixpac, similarly declared that "Mixpac uses a color code with its mixers to enable an end user to quickly identify the appropriate [t]ip that is matched with the same colored cartridge cap." App'x at 2629. Further,

Mixpac's advertising materials assert that "[i]n order to simplify handling MIXPAC is using color-coded mixers and outlet caps. The color of the outlet cap used for a certain dental product identifies the mixer best suited for th[e] product." App'x at 2468.

In addition to the bench trial testimony, the declarations of Mixpac employees, and Mixpac's advertising materials, websites advertise mixing tips based primarily on their color under Mixpac's system. A website for Dental City, for example, advertises a bag of 48 pink mixing tips with 5.4 millimeter diameters, the same diameter as Mixpac's pink mixing tips. Materials manufacturers also rely on Mixpac's color-coding scheme in their product use instructions. Thus, Mixpac is "the leader of its industry" and "holds nearly 100% of the market" of Candy Colored mixing tips. App'x at 2493.

On August 14, 2019, the district court issued its findings of fact and conclusions of law, and a final judgment and permanent injunction in Mixpac's favor. The district court concluded that the Candy Colors are non-functional because Mixpac's use of the colors "adds to the cost to Mixpac of making . . . mixing tips" and "[o]ther companies in the industry use different colors or no colors for their dental products including dental mixing tips." Special App'x at 3.

The district court incorporated its oral factual findings on the record at trial into its findings of fact and conclusions of law. At trial, the district court found that An was dishonest in his testimony and deliberately spoliated evidence of communications with potential customers following his attendance at the 2016 GNYDM. It also found that Cisneros' testimony was not credible. Most importantly, with respect to functionality, the district court applied the functionality standard as discussed in *Fabrication Enterprises, Inc. v. Hygenic Corp.*, 64 F.3d 53, 59 (2d Cir. 1995). It found that it was "satisfied from Dr. Glazer's quite persuasive and credible testimony that the degree of functionality here is small" and that "[m]ost important of all with respect to functionality is the fact that alternative designs are obviously and clearly available without impairing the utility of the product." App'x at 859. It thus rejected A&N's argument that color is a proxy for diameter. The district court acknowledged however, that "a small minority" of dentists "have [probably] asked for a yellow tip or a blue tip." App'x at 858.

The district court concluded that Mixpac proved by a preponderance of the evidence that it holds valid marks for the Candy Colors, that A&N "used a reproduction, counterfeit, copy, or colorable imitation" of the marks without

13

Mixpac's consent, and that it did so "in connection with the sale, distribution, or advertising of goods." Special App'x at 9-10. It also concluded that such use was likely to cause confusion and did cause confusion. The district court also concluded that A&N failed to prove their counterclaims by a preponderance of the evidence.[4]

**DISCUSSION**

On appeal from a bench trial, we determine whether the district court's "findings of fact were clearly erroneous." *Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 780 (2d Cir. 1991) (internal quotation marks omitted). Factual findings are clearly erroneous if "they are without adequate support in the record, are against the clear weight of the evidence, or are the product of an erroneous view of the law." *Id.* In addition, with respect to the district court's legal conclusions, "our scope of review is *de novo*." *Id.*

---

[4] We decline to rule as to the propriety of the district court's conclusion that A&N failed to prove their counterclaims by a preponderance of the evidence because A&N's brief does not explain why that was error. *See Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009) ("[I]ssues not sufficiently argued are in general deemed waived and will not be considered on appeal.") (internal quotation marks omitted).

## I. Functionality

A product's design "may acquire a distinctiveness which serves to identify the product with its manufacturer" and such design "is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001). The Lanham Act provides a cause of action when a person "uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a)(1)(A). The Lanham Act also prohibits:

> without the consent of the registrant— . . . us[ing] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1)(a).

There is, however, a "well-established rule that trade dress protection may not be claimed for product features that are functional." *TrafFix*, 532 U.S. at 29. In *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.*, the Supreme Court advised against overextension of trade dress, noting that "product design almost invariably

15

serves purposes other than source identification." 529 U.S. 205, 213 (2000). "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995). "Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products." *TrafFix*, 532 U.S. at 29. This applies even where an entity makes significant investments in a particular feature, because the Lanham Act "does not protect trade dress in a functional design simply because an investment has been made to encourage the public to associate a particular functional feature with a single manufacturer or seller." *Id.* at 34-35.

"Whether a trade dress is or is not functional is a question of fact disturbed on appeal only if clearly erroneous." *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1002 (2d Cir. 1997).[5] In our Circuit, "a product feature is

---

[5] A&N asserts in a footnote in its opening brief that this Court has not yet decided the standard of review applicable to a district court's functionality finding following the Supreme Court's decision in *TrafFix*. To the extent that this can be characterized as an argument, a footnote is "insufficient to raise the argument on appeal." *Citizens Against Casino Gambling in Erie Cnty. v. Chaudhuri*, 802 F.3d 267, 286 (2d Cir. 2015) ("Merely mentioning the relevant issue . . . is not

considered to be 'functional' in a utilitarian sense if it is (1) 'essential to the use or purpose of the article,' or if it (2) 'affects the cost or quality of the article.'" *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 219 (2d Cir. 2012) (footnote omitted) (quoting *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 850 n.10 (1982)). Product features are essential when they are "dictated by the functions to be performed by the article." *Id.* (internal quotation marks omitted); *accord Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 331 (2d Cir. 1983) ("[A] feature that merely accommodates a useful function is not enough."). A feature affects cost or quality when it "permits the article to be manufactured at a lower cost or constitutes an improvement in the operation of the goods." *Louboutin*, 696 F.3d at 219 (internal quotation marks omitted).

A feature can still be functional even if it is not essential to a product's use or purpose and does not affect a product's cost or operation. This is referred to as aesthetic functionality, where "the aesthetic design of a product is *itself* the mark for which protection is sought." *Id.* at 219-20 (emphasis in original). In such

---

enough; issues not sufficiently argued are in general deemed waived and will not be considered on appeal." (citation omitted)).

instances, this Court considers whether "giving the markholder the right to use it exclusively would put competitors at a significant non-reputation-related disadvantage." *Id.* at 220 (internal quotation marks omitted).

The district court did not apply the *Louboutin* test in either its oral statements on the record at the bench trial or in its findings of fact and conclusions of law. The district court's findings that Mixpac's use of colors for mixing tips adds to Mixpac's manufacturing costs and that some of Mixpac's competitors use different or no colors for their mixing tips are not clearly erroneous and are supported by the record. Jutzi testified that Mixpac incurs "significant cost" for adding Candy Colors to mixing tips. App'x at 582. Ferrari testified that "[m]any other mixing tips use colors different from the Candy Colors" and discussed a colorless universal mixing tip that Coltene manufactures. App'x at 614-15.

A&N does not argue to the contrary. Instead, A&N argues that the mixing tips' color coding helps users identify useful product characteristics, such as diameter. Because the color coding aids users, A&N argues that it affects the quality of the mixing tips and is "essential to how they are intended to be used." Appellants' Br. at 50. The evidence elicited at the bench trial does not support

A&N's argument that use of colors on mixing tips is essential to use of the product. Color-coded mixing tips and cartridges are simply not akin to the "dual-spring" traffic sign design in *TrafFix*, where the dual-spring system afforded a "unique and useful mechanism to resist the force of the wind" and wind resistance is essential to a traffic sign's purpose of alerting drivers. *TrafFix*, 532 U.S. at 33. The district court did not make a factual finding that colors are essential to the use or purpose of mixing tips, and we decline to do so on this record.

The evidence elicited at the bench trial, however, firmly establishes that the colors signify diameter, which in turn assists users with selecting the proper cartridge for their needs. As Mixpac's own employees acknowledge, the colors enable users to quickly match the proper mixing tip with the proper cartridge, and thereby "improve[] the operation of the goods." *Louboutin*, 696 F.3d at 219 (internal quotation marks omitted). The colors on the mixing tips serve roughly the same purpose as the colors of the flash-frozen ice cream that the Eleventh Circuit considered in *Dippin' Dots, Inc. v. Frosty Bites Distribution, LLC*, where the ice cream's colors signified flavor, i.e., pink signified strawberry, white signified vanilla, and brown signified chocolate, and were therefore found to be

19

functional. 369 F.3d 1197, 1203-04, 1207 (11th Cir. 2004); *see also Inwood*, 456 U.S. at 853, 856-58 (concluding that our Circuit erred when it set aside the district court's findings that colors of certain prescription drugs were functional, in part, because patients "associate[d] color with therapeutic effect" and "rel[ied] on color to differentiate one [drug] from another" because those facts were not clearly erroneous).

The district court arguably came to this very conclusion when it acknowledged in its oral findings a "small" "degree of functionality," after noting that "there are probably cases in which some dentists have asked for a yellow tip or a blue tip." App'x at 858-59. But its findings are unclear because it failed to apply the test set forth in *Louboutin*, and thus did not consider whether the colors affected the quality of the tips. *Louboutin* set out the three-step functionality test, where "[a]t the start, we address the two prongs of the *Inwood* test, asking whether the design feature is either essential to the use or purpose or affects the cost or quality of the product at issue. . . . Next, if necessary, we turn to a third prong, which is the competition inquiry . . . ." 696 F.3d at 220 (internal quotation marks omitted). We stressed that "if a design feature would, from a traditional utilitarian perspective, be considered essential to the use or purpose

20

of the article, or to affect its cost or quality, then the design feature is functional under *Inwood* and our inquiry ends." *Id.* (internal quotation marks omitted). If and only if a design feature is not functional in the traditional sense, do we move to the fact-intensive test where the feature must be "shown not to have a significant effect on competition in order to receive trademark protection." *Id.* The district court erred because it did not apply this test when it considered only that Mixpac's use of the Candy Colors adds to manufacturing costs and that other companies use different or no colors.

Mixpac does not refute by evidence or argument that, because the colors on the tip correspond to the tip sizes, the color affects the quality of the product. It argues only that Cisneros, A&N's expert witness, testified that choosing a mixing tip based on color alone would be "stupid." Appellee's Br. at 27 (citing App'x at 214). But that does nothing to counter A&N's argument because the functionality doctrine does not require that a product's functional feature be the only reason why relevant consumers purchase it. We thus conclude that the colors are functional, rendering Mixpac's trade dress unprotectible. Our finding of functionality means we need not reach A&N's arguments that the district court's counterfeiting and infringement analyses were fatally flawed. *See TrafFix*,

532 U.S. at 33 ("Functionality having been established, whether [the] design has acquired secondary meaning need not be considered. There is no need, furthermore, to engage . . . in speculation about other design possibilities . . . .")

**II. Contempt**

A&N complains that the district court did not rule on whether A&N should be held in contempt. It argues that the default judgments underlying the claim are legal nullities because (1) Seil Global was not subject to personal jurisdiction and (2) even assuming the court could exercise jurisdiction, the injunction underlying the claim is fatally vague under Federal Rule of Civil Procedure 65(d)(1)(C). The district court did not reach the merits of Mixpac's contempt claim. We generally refrain from considering issues not decided by the district court. *See United States v. Gomez*, 877 F.3d 76, 92 (2d Cir. 2017). Though we have "broad discretion" to consider issues "raised, briefed, and argued in the district court," we are "more likely to exercise our discretion (1) where consideration of the issue is necessary to avoid manifest injustice or (2) where the issue is purely legal and there is no need for additional fact-finding." *Id.* (internal quotation marks, alterations, and citations omitted). We see no reason to deviate from our practice. For the same reason, we do not decide the issue of personal

22

jurisdiction. We also decline to consider A&N's argument that the injunction is fatally vague, as A&N has failed to show manifest injustice would result. On remand, the district court is free to consider Mixpac's contempt claim in the first instance.

Finally, we see no reason to reassign this case on remand. Reassignment upon remand is a "serious request rarely made and rarely granted." *United States v. Awadallah*, 436 F.3d 125, 135 (2d Cir. 2006). We are not "persuaded that the original judge would have substantial difficulty in putting out of . . . mind . . . previously expressed views" or that "reassignment is advisable to preserve the appearance of justice." *Id.* (internal quotation marks omitted); *see also Ligon v. City of New York*, 736 F.3d 118, 128-29 (2d Cir. 2013) (granting request to reassign upon remand because judge demonstrated partiality towards plaintiffs based on statements made during trial and judge's participation in media interviews), *vacated in part on other grounds*, 743 F.3d 362 (2d Cir. 2014).

## CONCLUSION

We conclude that the record evidence establishes that Mixpac's use of colors on its mixing tips affects their quality by identifying the mixing tip's diameter, rendering the trade dress functional. We decline to address the

23

contempt claim, on which the district court did not rule. Upon remand, the district court should consider the contempt claim. The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.