# United States Court of Appeals for the Federal Circuit

_____

**FOCUS PRODUCTS GROUP INTERNATIONAL, LLC, ZAHNER DESIGN GROUP, LTD., HOOKLESS SYSTEMS OF NORTH AMERICA, INC., SURE FIT HOME PRODUCTS, LLC, SURE FIT HOME DECOR HOLDINGS CORP., SF HOME DECOR, LLC,**
*Plaintiffs-Appellees*

**v.**

**KARTRI SALES CO., INC., MARQUIS MILLS, INTERNATIONAL, INC.,**
*Defendants-Appellants*

_____

2023-1446, 2023-1450, 2023-2148, 2023-2149

_____

Appeals from the United States District Court for the Southern District of New York in No. 1:15-cv-10154-PAE, Judge Paul A. Engelmayer.

_____

Decided: September 30, 2025

_____

MORRIS E. COHEN, Goldberg Cohen LLP, New York, NY, argued for plaintiffs-appellees. Also represented by LEE A. GOLDBERG; DONALD RHOADS, Rhoads Legal Group PC, New York, NY.

PATRICE POLYXENE JEAN, Hughes Hubbard & Reed LLP, New York, NY, argued for defendant-appellant Kartri

Sales Co., Inc.   Also represented by EMMA L. BARATTA,
LYNN M. RUSSO.

DONALD J. COX, JR., Law Offices of Donald Cox, LLC,
Princeton, NJ, argued for defendant-appellant Marquis
Mills, International, Inc.

_____

Before MOORE, *Chief Judge*, CLEVENGER and CHEN,
*Circuit Judges*.

CHEN, *Circuit Judge*.

This case concerns intellectual property infringement
allegations involving shower curtains having embedded
rings, instead of hooks, to attach the curtain to a rod. Kar-
tri Sales Co., Inc. (Kartri) and Marquis Mills, Interna-
tional, Inc. (Marquis) (collectively, Appellants) appeal
several decisions of the United States District Court for the
Southern District of New York. In these decisions, the dis-
trict court found that Appellants infringed several patent,
trademark, and trade dress rights owned by Focus Prod-
ucts Group International, LLC, Zahner Design Group, Ltd.,
Hookless Systems of North America, Inc., Sure Fit Home
Products, LLC, Sure Fit Home Décor Holdings Corp., and
SF Home Decor, LLC (collectively, Focus or Appellees).

In the proceedings before the district court, the district
court denied Appellants' motion to transfer venue because,
among other reasons, it was not timely raised. The district
court then granted summary judgment of patent infringe-
ment for Appellees, determining that Appellants infringed
various claims of U.S. Patent Nos. 6,494,248 ('248 patent),[1]

_____

[1]   On August 29, 2017, the U.S. Patent and Trade-
mark Office (USPTO) issued an *ex parte* reexamination cer-
tification amending the '248 patent. *See* U.S. Patent No.
6,494248 C1.

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.          3
KARTRI SALES CO., INC.

7,296,609 ('609 patent), and 8,235,088 ('088 patent) (collectively, asserted patents) based on the district court's claim constructions.  The district court also denied Appellants' unclean hands defense because it was improperly raised on the eve of trial.  After a bench trial, the district court found that Kartri infringed Focus's HOOKLESS® trademark (HOOKLESS® mark) and that Appellants infringed Focus's EZ ON trademark (EZ ON mark) (collectively, the marks), as well as its shower curtain trade dress.  The district court also found that Appellants' infringement of the asserted patents and trade dress was willful and awarded lost profits, reasonable royalty, and attorneys' fees to Appellees.

For the reasons explained below, we *affirm in part*, *reverse in part*, *vacate in part*, and *remand*.  First, regarding Appellants' appeal, we affirm the denial of Appellants' motion to transfer venue and affirm the denial of Appellants' affirmative defense of unclean hands.  However, we vacate (1) the trade dress infringement finding; (2) the willfulness finding; and (3) the award of attorneys' fees.  We also reverse the EZ ON trademark infringement finding.  Next, as to Marquis's appeal specifically, we additionally vacate the '088 patent infringement finding and reverse the '248 and '609 patent infringement findings.  Finally, as to Kartri's appeal specifically, we affirm the '248, '609, and '088 patent infringement findings, but vacate the HOOKLESS® trademark infringement finding.

## BACKGROUND

Focus and its predecessors invented and obtained several patents on a type of shower curtain—a "hookless" curtain—that does not require hooks to attach the curtain to a shower rod, but instead provides a series of openings along the curtain's top end, reinforced by rings, to receive

the shower rod. The asserted three utility patents[2] explain that the openings in the shower curtain, along with their corresponding reinforcing rings, are designed in such a way that permits "a curtain . . . to be attached to a mounting rod without the need for hanging support hooks [or] clips . . . while also avoiding the need to remove the rod from its supports."[3] '248 patent col. 1 ll. 42–45. As shown in Figures 2–3, each ring has a slit or gap that extends from the ring's inner circumference to its outer circumference for ease of the ring's attachment to and detachment from a shower rod. *Id.* at col. 4 ll. 19–62.



'248 patent FIGS. 2–3.

Claim 1 of each of the asserted patents is representative. While these claims are directed to a shower curtain, they are particularly focused on shower rings with a novel slit design and/or "projecting edge" that projects away from

---

[2]    Focus also asserted infringement of a design patent, which was cancelled after reexamination.

[3]    We cite only to the '248 patent when citing to the written description of the asserted patents because the '609 and '088 patents are continuations of the '248 patent and all three patents have the same written description and drawings.

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.    5
KARTRI SALES CO., INC.

the ring's outer circumference.  For the '248 patent, claim 1 recites a shower ring slit, a portion of which is "approximately horizontal":

1. A product comprising:

an item for hanging, wherein said item is a curtain,

said item comprising an opening for suspending said item from a rod,

said item comprising a ring attached to said opening such that said opening is reinforced by said ring,

said ring comprising an inner circumference,

said inner circumference comprising a top when said item is hanging,

said item comprising an upper edge,

said item comprising *a slit extending from said upper edge through said ring to said opening*,

*said slit intersecting said inner circumference of said ring at a point offset from said top*,

*said slit further comprising an approximately horizontal component when said item is hanging from the rod*, and

*wherein said slit exits said ring at said upper edge of said curtain.*

6          FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.
                              KARTRI SALES CO., INC.

'248 patent at claim 1 (emphases added). Figure 20 illustrates one embodiment for the '248 patent:



'248 patent FIG.20.

Claim 1 of the '609 patent recites a shower ring having a "projecting edge" that projects from the ring's outer circumference:

> 1. A product, said product comprising:
>
>> a curtain, said curtain comprising a ring, said ring comprising an outer circumference;
>>
>> said curtain comprising an opening such that said curtain is suitable for suspension from a rod;
>>
>> said ring comprising a slit extending through said ring to said opening;
>>
>> *wherein said ring comprises a projecting edge, said projecting edge being an edge which projects from said outer circumference of said ring, and wherein said projecting edge is provided next to said slit.*

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.                    7
KARTRI SALES CO., INC.

'609 patent at claim 1 (emphasis added). Figure 19 illus-
trates an embodiment of the '609 patent:



'609 patent FIG. 19.

Claim 1 of the '088 patent recites a shower ring includ-
ing a flat upper edge, a projecting edge that projects from
the ring's outer circumference, and a slit located in a par-
ticular part of the ring:

1. A product, said product comprising:

a shower curtain, said shower curtain com-
prising an outer edge and an opening such
that said product is suitable for suspension
from a rod, said shower curtain further
comprising a ring, wherein said ring rein-
forces said opening;

*said ring comprising a flat upper edge*, an
inner circumference, and an outer circum-
ference;

said ring further comprising a slit extend-
ing from said inner circumference through
said ring and through said outer edge of
said shower curtain;

*said ring further comprising a projecting
edge, said projecting edge being an edge*

> *which projects from said outer circumference of said ring; and,*
>
> *wherein said slit exits said inner circumference at a location which is offset from the 12 o'clock position on said inner circumference.*

'088 patent at claim 1 (emphases added). Figure 31B illustrates an embodiment of the '088 patent:



'088 patent FIG. 31B.

Focus sold its patented shower curtains under the HOOKLESS® mark and the EZ ON mark. The HOOKLESS® mark is registered with the United States Patent Trademark Office (PTO) under U.S. Registration Nos. 2,355,554, 2,381,995, and 4,127,283[4] while the EZ ON mark was not registered when Focus first filed its complaint against Kartri and Marquis, but has since been registered under U.S. Registration No. 5,296,144.[5] In addition to these trademarks, Focus also claimed that it has unregistered trade dress rights in the overall appearance of

---

[4]    The 2,355,554 and 4,127,283 marks are on the principal register while the 2,381,995 is on the supplemental register.

[5]    The 5,296,144 mark is on the principal register.

shower curtains sold under the marks. Focus described the scope of its trade dress as encompassing:

> (1) a shower curtain wherein the curtain lacks any hooks protruding above the upper edge of the curtain, so that Plaintiffs' shower curtain provides the visual appearance of an essentially "neat" and "orderly" upper edge;

> (2) and wherein the shower curtain has a row of rings along the upper portion of the shower curtain, those rings being attached to the material of the shower curtain such that the bottom surface of each ring (on one or both sides of the shower curtain) is essentially co-planar with the material of the shower curtain, also providing an essentially "neat" and "orderly" appearance;

> (3) wherein each ring includes a slit or gap in the ring;

> (4) and wherein the shower curtain's rings or pairs of rings, and the associated slits or gaps, are each fixed in place on the shower curtain and provide an organized and symmetrical repeating visual pattern along the top width of the shower curtain.

*Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, 647 F. Supp. 3d 145, 207–08 (S.D.N.Y. 2022) (*Bench Trial Order*) (citation omitted).

On February 27, 2015, Focus sent a cease-and-desist letter to Kartri, asserting infringement of Focus's three utility patents. In particular, Focus informed Kartri that it was not authorized to use Focus's patented technology on its "Ezy-Hang" shower curtains (accused products). J.A. 6888. Although Kartri forwarded this letter to its supplier, Marquis, neither Kartri nor Marquis took any immediate action because Marquis was assured by its Chinese supplier that its hook-free shower curtain did not infringe any existing patents, and that the supplier had a Chinese

patent and was working on obtaining a U.S. patent. *Bench Trial Order*, 647 F. Supp. 3d at 189–90.

On June 30, 2015, Focus sued Kartri in the Southern District of New York for infringement of the '248, '609, and '088 patents and its EZ ON mark. J.A. 524. Kartri impleaded Marquis in February 2016, and Focus amended its complaint in March 2016 to include Marquis as a defendant. *Id.* at 525. After subsequent amendments, the final operative complaint alleged that Kartri and Marquis infringed the asserted patents, the marks, and the trade dress directed to "the visual appearance of shower curtains sold under [Focus's] HOOKLESS® brand." *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc.*, 454 F. Supp. 3d 229, 238 (S.D.N.Y. 2020) (*Summary Judgment Order*) (citation omitted).

On September 18, 2017, approximately four months after the Supreme Court's decision in *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 581. U.S. 258 (2017), Appellants raised their objections to venue for the first time in a joint letter to the court. J.A. 754–56. Appellants then filed a motion to dismiss or transfer venue, arguing that venue in the Southern District of New York was improper under *TC Heartland*. *See* J.A. 795; J.A. 9. The district court denied the motion, reasoning that Appellants have "forfeited [their] venue objection by failing to raise it seasonably, by formally submitting to the cause, and by actively conducting litigation in this venue after issuance of *TC Heartland*." J.A. 12 at 11:17–21.

Subsequently, the district court construed several disputed claim terms of the asserted patents. Relevant to this appeal, the district court construed the terms "ring," "inner circumference," "outer circumference," and "projecting edge." *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, No. 1:15-cv10154-PAE, 2018 WL 3773986 (S.D.N.Y. Aug. 9, 2018) (*Markman Order*). With these constructions, the district court found no triable issue of fact as to whether

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.            11
KARTRI SALES CO., INC.

Appellants infringed the asserted patents and granted Focus's motion for summary judgment. *See Summary Judgment Order*, 454 F. Supp. 3d at 241–46. The court, however, found genuine disputes of material fact regarding whether Focus has standing to enforce the EZ ON mark because there was a dispute on whether Focus owned the mark at the time of its complaint filing. *Id.* at 248.

On the eve of its bench trial, Marquis raised defenses that it had not raised earlier, including unclean hands and equitable estoppel. *Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co.*, No. 1:15-cv- 10154-PAE-SDA, 2023 WL 3815276, at *6 (S.D.N.Y. June 5, 2023) (*Post-trial Order*). Because Appellants did not raise these defenses until the brink of trial, the district court precluded them from raising it at the upcoming bench trial. *Id.* After the trial, the district court issued a 168-page ruling, holding that (1) Focus did have standing to enforce the EZ ON mark, (2) both Kartri and Marquis infringed Focus's EZ ON mark and trade dress, which it determined to be non-functional, and (3) Kartri infringed Focus's HOOKLESS® mark. *Bench Trial Order*, 647 F. Supp. 3d at 271.

The district court then awarded $970,324 in lost profits for the period of infringement, beginning on October 16, 2013 and ending on November 15, 2018 when Appellants stopped selling the infringing shower curtains. *Post-trial Order,* 2023 WL 3815276, at *2. It trebled the award for the period from March 1, 2015, to November 15, 2018, resulting in a total lost profits award of $2,783,687. *Id.* Additionally, the district court awarded reasonable royalties of $53,907 for the period of infringement and $154,649 for the trebled period. *Id.* Finally, the district court found the case exceptional and granted $929,126.95 in attorneys' fees, as well as costs and pre- and post-judgment interest. *Id.* at *16.

Marquis and Kartri timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

STANDARD OF REVIEW

"Whether venue is proper under [28 U.S.C.] § 1400(b) is an issue unique to patent law and is governed by Federal Circuit law." *In re ZTE (USA) Inc.*, 890 F.3d 1008, 1012 (Fed. Cir. 2018). We review venue under 28 U.S.C. § 1400(b) de novo. *Westech Aerosol Corp. v. 3M Co.*, 927 F.3d 1378, 1381 (Fed. Cir. 2019). We review findings of waiver of venue objections for abuse of discretion. *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 942 F.3d 1119, 1132 (Fed. Cir. 2019); *see In re Micron Tech., Inc.*, 875 F.3d 1091, 1095–96 (Fed. Cir. 2017). Where standing is determined based on complaint allegations and undisputed facts in the record, it is reviewed de novo, but if the court resolves disputed facts in ruling on standing, those findings are accepted unless clearly erroneous. *Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79, 84–85 (2d Cir. 2014); *Enovsys LLC v. Nextel Commc'ns, Inc.*, 614 F.3d 1333, 1340–41 (Fed. Cir. 2010).

We review a district court's grant of summary judgment under the law of the regional circuit, here the Second Circuit. *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1358 (Fed. Cir. 2011). The Second Circuit reviews the grant or denial of summary judgment de novo. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir. 2008). Summary judgment is properly granted only when, drawing all reasonable inferences in the nonmovant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–57 (1986).

"We review claim construction based on intrinsic evidence de novo and review any findings of fact regarding extrinsic evidence for clear error." *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1378 (Fed. Cir. 2021) (citation omitted). The determination of whether a properly construed claim literally reads on an accused product is a

question of fact. *Gen. Mills, Inc. v. Hunt–Wesson, Inc.,* 103 F.3d 978, 981 (Fed. Cir. 1997).

On appeal from a bench trial, the district court's findings of fact are reviewed for clear error and its conclusions of law are reviewed de novo. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1337 (Fed. Cir. 2005). In reviewing issues not within this court's exclusive jurisdiction, this court applies the law of the regional circuit, in this case the Second Circuit. *Cicena Ltd. v. Columbia Telecomms. Grp.*, 900 F.2d 1546, 1548 (Fed. Cir. 1990). As to trademark infringement, the Second Circuit reviews underlying factual determinations for clear error, but the ultimate determination of likelihood of confusion of trademarks de novo. *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004). Similarly, whether a trade dress is or is not functional is a question of fact that is reviewed for clear error. *Sulzer Mixpac AG v. A&N Trading Co.*, 988 F.3d 174, 182 (2d Cir. 2021).

An award of enhanced damages for willfulness and a grant of attorney's fees are both reviewed for abuse of discretion. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 107 (2016).

## DISCUSSION

### I. Venue

Appellants contend that the district court abused its discretion in denying their motion to transfer venue after the issuance of *TC Heartland*.[6] Kartri Opening Br. 32–33.

---

[6] We cite only to Kartri's brief when citing to Appellants' venue arguments because both parties raised the same objections. *Compare* Kartri Opening Br. 32–38 (asserting the district court erred in finding forfeiture), *with* Marquis Opening Br. 32 (asserting same, but more abbreviated).

Specifically, Appellants argue the district court incorrectly ruled that they forfeited their venue objections "by failing to raise it seasonably, by submitting to the cause, and by submitting through its conduct." J.A. 9–10 at 8:24–9:1; *see* Kartri Opening. Br. 33–37. We disagree.

*TC Heartland* held that a domestic corporation "resides" only in its state of incorporation for purposes of the patent venue statute, 28 U.S.C. § 1400(b). 581 U.S. at 262. Although we determined that *TC Heartland* constitutes a change in controlling law such that a previously unavailable venue defense became available, "thus making the waiver rule of Rule 12(g)(2) and (h)(1)(A) inapplicable," we also concluded that this waiver rule "is not the only basis on which a district court might reject a venue defense for non-merits reasons, such as by determining that the defense was not timely presented." *In re Micron*, 875 F.3d at 1094. For example, we previously found no abuse of discretion when a district court held that the moving party waived its venue defense because it waited "almost thirty days" following the *TC Heartland* decision. *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1351 (Fed. Cir. 2019).

Similarly, the district court here soundly exercised its discretion in finding that Kartri's venue objection "simply took too long." J.A. 12 at 11:22. *TC Heartland* was published on May 22, 2017, but neither Marquis nor Kartri raised any venue objection until September 18, 2017. *Id.* at 14 at 13:4–6. While we have previously held that a moving party did not forfeit its venue rights by filing a motion to dismiss 21 days following *TC Heartland*, we did so because (1) the case was in an early stage, (2) the moving party's answer "expressly put respondents and the district court on notice that [the moving party] was watching *TC Heartland* to see if the defense would become available," and (3) there was no "conduct post-*TC Heartland* that would indicate in any way that [the moving party]

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.
KARTRI SALES CO., INC.

15

somehow consented or submitted to venue." *In re Oath Holdings Inc.*, 908 F.3d 1301, 1306 (Fed. Cir. 2018).

The facts of *Oath Holdings* are not found here. The district court litigation in *Oath Holdings* had not progressed past written discovery when we ruled on Oath's writ of mandamus. *Id.* Conversely, when Kartri brought its venue motion, the parties had already taken several depositions. J.A. 807; *see, e.g.,* J.A. 2309 (Kartri's vice president deposed on August 10, 2017). Additionally, neither Marquis nor Kartri timely notified the district court that venue might be improper, "fail[ing] to raise any objection for four months" after the publication of *TC Heartland*. J.A. 13 at 12:6–7. Finally, unlike in *Oath Holdings*, Appellants here waited much longer to file their transfer motion, continuing to litigate for several months in the Southern District of New York following *TC Heartland*. *See* J.A. 489–91.

The district court therefore did not abuse its discretion in holding that Appellants forfeited their venue objection. Accordingly, we affirm the district court's denial of Appellants' motion to dismiss or transfer venue.

## II. Patent Infringement

Marquis argues that the district court erroneously granted summary judgment of patent infringement because (1) the district court improperly found no prosecution history disavowal for the '248 and '609 patents; and (2) the district court improperly construed "outer circumference" with regards to the '088 patent. We address each issue in turn.

## A. The '248 and '609 Patents

Marquis raises several separate arguments for why the district court erroneously granted summary judgment of patent infringement for the '248 and '609 patents. *See* Marquis Opening Br. 33–34. As to its argument concerning the "ring" claim limitation, we agree with Marquis that

the prosecution histories of the relevant asserted patents show that the patent owner clearly disavowed a ring having a flat upper edge. As the accused products only contain rings with a flat upper edge, *see* Oral Arg. at 11:18–38, 28:49–29:07 (available at https://oralarguments.cafc.us courts.gov/default.aspx?fl=23-1446_05052025.mp3) (Oral Arg.), we reverse the district court's patent infringement determination for the '248 and '609 patents.

In the district court proceedings, the court construed the term "ring" as "a piece of material that is curved at least in part and that generally encloses and reinforces an opening." *Markman Order*, 2018 WL 3773986, at \*4 (footnote omitted). In so doing, the district court rejected Appellants' argument that the prosecution history unambiguously showed that Focus disavowed any non-circular construction of the "ring" limitation. *See id.* at \*5–6. The district court erred.

To determine the meaning of the asserted claims, courts look "first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Claim terms are generally given their plain and ordinary meanings as understood by a skilled artisan, when read in the context of the specification and prosecution history. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). In particular, claim scope can be narrowed "when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). This disavowal must be "clear and unmistakable" so as to overcome the "heavy presumption" that claim terms carry their full ordinary and customary meaning. *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1350 (Fed. Cir. 2013) (citation omitted). We have explained, for example, that, during prosecution, mere "election of an invention in response to an ambiguous restriction

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.
KARTRI SALES CO., INC.                                    17

requirement . . . cannot be said to provide any guidance forming a basis for narrowing a broadly drafted claim." *Id.* at 1351.

The prosecution history here paints a clear and consistent picture that the '248 and '609 patents exclude shower rings having a flat upper edge. The parent '248 patent application initially contained several claims covering different embodiments of the invention (e.g., rings that are elongated, rings with a projecting edge, and rings with a flat upper edge). During the prosecution of the '248 patent, the examiner identified that these claims were directed to multiple patentably distinct species and instructed the patentee to elect one species for continued prosecution on the merits. J.A. 1409. Although the examiner did not describe what was distinct about each species, he defined the boundaries of the different inventions through the patent application's figures, with different claimed species being drawn to different sets of figures. *Id.* For example, the examiner indicated that "Group IV" or "Species IV" is drawn to

Figures 18–20 and "Group V" or "Species V" corresponds to Figure 21. *Id.* Figures 18–21 are shown below:



'248 patent FIGS. 18–21.

Figures 18–20 are directed to rings with "[a] projection, extension or finger" that "are projections off of the ring (preferably off of the ring's outer circumference)[.]" '248 patent col. 7 ll. 42–48. Figure 21, on the other hand, is directed to rings "with a flat upper edge" that "provides support over a length equal to approximately the outer diameter of the ring [] for each ring." *Id.* at col. 8 ll. 35–41.

The patentee responded by electing a species ("Group IV" or "Species IV"), i.e., Figures 18–20, without objecting

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.                    19
KARTRI SALES CO., INC.

to how the examiner defined said species.[7] J.A. 1411; *see also* J.A. 1417. The patentee instead remarked that it understood that "[t]he elected inventions of Group IV are hanging products having rings with an offset slit and/or new finger configurations." J.A. 1417. The patentee then added new claims directed to the elected species. *Id.* However, among the several dozen newly added claims was dependent claim 73, which recited a "ring [that] includes a flat upper edge along at least a portion of said ring." J.A. 1413.

The examiner carefully reviewed the newly added claims and found dependent claim 73, among other claims, to be improperly "drawn to a nonelected species," i.e., Species V (Figure 21). J.A. 1423. Also importantly, the examiner did not find independent claim 61 drawn to a nonelected species, even though claim 73 depends therefrom, and it differs from claim 73 in only one aspect—the ring in claim 73 recites "a flat upper edge along at least a portion of said ring," whereas the ring in claim 61 does not. J.A. 1412–13. The examiner determined that claims directed to nonelected species were withdrawn from consideration. This withdrawal made the record clear that the boundaries of Species IV—Figures 18–20—exclude a flat upper edge.[8] The patentee could have disagreed with the examiner's narrowing of the patent scope at this juncture but, as with the initial restriction requirement, did not do so. Instead of disputing the withdrawal of claim 73, the patentee followed the examiner's characterization of

---

[7] During the prosecution of the '609 patent, the patentee also elected the invention of Species IV without objecting to how the examiner defined said species. J.A. 1035. Accordingly, what happened in the '248 prosecution history applies equally to the '609 patent claims.

[8] Rings with a flat upper edge are described by Species V, which is drawn to Figure 21. J.A. 1409.

20        FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.
                                    KARTRI SALES CO., INC.

elected Species IV by continuing to prosecute the non-withdrawn claims in the '248 patent application and amending other claims to overcome the examiner's indefiniteness and anticipation rejections.  *See* J.A. 1431–32 (acknowledging the examiner's office action that withdrew claim 73, without objecting to such withdrawal).

Furthermore, in the Notice of Allowance, the examiner gave the patentee another chance to challenge the examiner's position that claim 73's "flat upper edge" ring was subject matter that fell outside the scope of the patentee's election of Species IV.  In this notice, the examiner maintained the withdrawal of claim 73 and noted that, should the patentee find the withdrawal "unacceptable," the patentee could still challenge the cancellation of claim 73 at this point, if it so chose.  J.A. 1444.  Instead of contesting the cancellation of dependent claim 73, the patentee sent in a marked-up version of independent claim 61 without any objection to the canceled claim 73.  J.A. 1452–53. While we are mindful that "it is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the claims," *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1124 (Fed. Cir. 2004), cases admonishing reliance on an examiner's interpretation of a claim scope to determine said scope "typically involve an applicant standing silent when confronted by statements made by the examiner during prosecution, most often in the examiner's Statement of Reasons for Allowance." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1097 n.6 (Fed. Cir. 2013) (citations omitted).  Here, by cooperating with the examiner's repeated demand to exclude rings with a flat upper edge from the '248 and '609 patents, in keeping with the initial restriction requirement, the patent owner made it clear that it accepted the narrowed claim scope for these patents.  *See id.* (holding there is prosecution history disclaimer based on the inventor's acquiescence to the examiner's interpretation of their claim scope because the

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.
KARTRI SALES CO., INC.

21

applicant did not merely acquiesce to "an examiner's narrow characterization of a claim term, but also . . . [adopted] that characterization to overcome the examiner's enablement rejection"). Unlike in *Plantronics*, where "[n]either the PTO nor [applicant] made any particular remarks regarding the differences (e.g., in structure) of what the PTO found to be different inventions" claimed in a single application, 724 F.3d at 1351, the record here contains multiple instances of the examiner policing the boundaries of the relevant claims and the patentee accepting the examiner's particular understandings of the scope of various claims.

The prosecution history of the '088 patent further confirms Focus's acceptance of the narrowed claim scope. During prosecution of the '088 patent, the patent examiner rejected all claims "on the ground of nonstatutory obviousness-type double patenting" in view of the '248 and '609 patents. J.A. 1135. In response, the patentee amended the claims to distinguish them from the claims of the prior patents by including, among other things, a ring with "a flat upper edge," thereby showing that it understood that its prior patents did not encompass a ring having a flat upper edge. J.A. 1147. The examiner then withdrew the double patenting rejection, explicitly stating that "[i]nasmuch as the claims have been amended to incorporate the limitation of the flat upper edge which is drawn to a species which is not encompassed with the species as set forth in the applicant's prior patents[,] the double patenting rejection is no longer applicable." J.A. 1182. Consistent with its actions during the prosecution of the '248 patent, the patentee accepted the examiner's characterization of the scope of the '248 and '609 patents and continued to prosecute the '088 patent. *See, e.g.*, J.A. 1189–93. The district court's construction abolishes this line of demarcation developed during the prosecution history—under its interpretation, claims in the '088 patent would be directed towards the invention set forth in the claims of the '248 and '609 patents, extinguishing the examiner's withdrawal of the

nonstatutory double patenting rejection.  *See Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 688 (Fed. Cir. 1990) ("Consonance requires that the line of demarcation between the 'independent and distinct inventions' that prompted the restriction requirement be maintained." (quoting 35 U.S.C. § 121)).

Both the '248 and '088 patent prosecution histories show a clear and consistent picture of the patent examiner diligently managing the boundaries of claimed subject matter across multiple patent applications to ensure that the integrity of the initial restriction requirement was maintained.  Reading the two prosecution histories in relation to each other shows that the patentee disclaimed the "flat upper edge" claim scope during its prosecution of the '248 and '609 patents, and subsequently acknowledged the narrowed scope of such patents during its prosecution of the '088 patent.  Having done so, the patentee cannot try to reclaim the scope it previously disclaimed in the '248 and '609 patents.

Accordingly, we reverse the district court's construction of the "ring" limitation insofar as its construction includes rings with "flat upper edges."[9]  Because both parties admit that the accused products only contain rings with flat upper edges, Oral Arg. at 11:20–11:35, 28:49–29:07, we also reverse the district court's grant of summary judgment holding that the accused products infringed the '248 and '609 patents.

---

[9]    Although Marquis articulated five arguments against the district court's grant of summary judgment, we need only consider Marquis's "ring" limitation contention to resolve the district court's infringement determination for the '248 and '609 patents.  *See* Marquis Opening Br. 33–50.

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.                    23
KARTRI SALES CO., INC.

## B.   The '088 Patent

The district court construed "projecting edge" to mean "an edge that projects from the outer circumference of the ring." *Markman Order*, 2018 WL 3773986, at *11. Marquis argues that this construction does not sufficiently differentiate the ring's projecting edge from the ring's outer circumference, and thus "add[s] confusion to where the outer circumference ends and the projecting edge begins, even in the context of a predictable structure like a circle." Marquis Opening Br. at 46–47 (citation omitted). Marquis asserts that the correct construction aligns with the specification, which, in its view, explicitly requires the projecting edge to be "a structure that 'projects from' the outer circumference." *Id.* at 50–51 (quoting *Markman Order*, 2018 WL 3773986, at *11). We disagree.

The court's construction is consistent with the specification, which defined the projecting edge as "projections off of the ring (preferably off of the ring's outer circumference)[.]" '088 patent col. 7 ll. 60–61. The court explained that "the specification does not suggest that the projecting edge *must* be a structural element such as a finger. Rather, the specification provides only that such an element would itself be a 'projection.'" *Markman Order*, 2018 WL 3773986, at *10 (emphasis in original). Accordingly, there is no reason to depart from the construction that a "projecting edge" is "an edge that projects from the outer circumference of the ring." *Id.* at *11. This construction aligns with the language of claim 1 of the '088 patent, which recites a "ring further comprising a projecting edge" and does not mention any distinctive structural member. '088 patent at claim 1. It also does not conflict with the specification's use of the term "projecting edge," which merely identifies examples and explains that "[a] projection, extension or finger can also be provided to the ring as shown in FIGS. 18, 19 and 20. As illustrated in the figures, . . . a ring 200, 210 or 220 is provided with a projecting edge,

flange, extension, or finger 206, 216, or 226." *Id.* at col. 7 ll. 55–59.



'088 patent FIGS. 18, 19, and 20 (annotations added to identify exemplary projecting edges).

Although we agree with the district court's construction of "projecting edge," its infringement analysis on this issue was, at a minimum, inadequate to sustain summary judgment. In its summary judgment order, the district court failed to explain its reasoning for why one section of the outer edge of an accused product is the "outer circumference," while the other section ought to be deemed the "projecting edge." *See Summary Judgment Order*, 454 F. Supp. 3d at 243–44. The district court's analysis does little more than reference a reproduction of Focus's exhibit 4, a photograph of one of Appellants' accused products.



*Id.* at 244 (citation omitted) (annotation added to show outer circumference).

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.                25
KARTRI SALES CO., INC.

From this exhibit, the district court stated that it "has no trouble finding that . . . the projecting edge is 'next to said slit,'" and concluded "that no reasonable juror could find that defendants' design does *not* include a 'projecting edge.'" *Id.* at 243–44 (emphasis in original).

Yet, Appellants' accused rings look essentially identical to Figure 21 of the '088 patent:

**FIG. 21**



'088 patent FIG. 21.

The '088 patent discloses many ring embodiments with a "projection, extension or finger" that projects off the ring. *See, e.g.,* '088 patent col. 7 ll. 55–56 (disclosing that "[a] projection, extension or finger can also be provided to the ring as shown in FIGS. 18, 19 and 20."); *id.* at col. 10 ll. 55–63 (disclosing that Figure 31B has an "[e]xtension 408 off of the ring 400"). Contrary to Focus's contention, nothing in the specification gives any indication that any portion of Figure 21's ring should be understood as a "projecting edge." The specification merely describes Figure 21's ring 230 as having "a flat upper edge 235," *id.* at col. 9 ll. 11–12, that "can be the entire upper edge of the ring." *Id.* at col. 9 ll. 17–18. This upper edge can alternatively be just "a portion of the upper edge, e.g., in conjunction *with an extension off the ring, as shown, for example in FIGS. 18–20.*" *Id.* at col. 9 ll. 18–21 (emphasis added). The most reasonable reading of the specification, then, is that Figure 21 lacks a projecting edge.

This reading is supported by the prosecution history of the '088 patent. During the prosecution, the patentee needed to identify written description support for a shower ring claim that includes both "a flat upper edge" and "one or more projections." *See* J.A. 1180; J.A. 1193; J.A. 1197. For support for the "projecting edge" feature, the patentee relied on Figure 31B but did not rely on Figure 21. J.A. 1202. The patentee only pointed to Figure 21 as support for a different limitation—a shower ring with a flat upper edge. *See id.* Accordingly, a skilled artisan reviewing the intrinsic record of the '088 patent would not understand Figure 21's ring and its flat upper edge as also containing a projecting edge.

In light of this understanding of Figure 21 and its strong similarity to the accused ring, the district court needed to explain why a portion of the accused ring's outer edge section constitutes a "projecting edge" that projects off of the outer circumference, as opposed to simply being a continuation of the ring's "outer circumference." The district court also needed to address Marquis's argument that its construction produces nonsensical results, i.e., if we remove the "projecting edge" allegedly found in Appellants' product, the ring would be destroyed.[10] J.A. 2416. Absent

---

[10] During oral argument, Focus appeared to contend that the "outer circumference" of the accused ring must be only the curved perimeter edge, and the "projecting edge" is the portion of the perimeter edge that appears as a straight edge. *See* Oral Arg. at 35:09–36:07. But Focus did not articulate any principled reason for carving up the accused ring's perimeter edge in that way. Focus's position is especially problematic given that the district court "decline[d] [Appellants' invitation] to import a circularity restriction into the construction of 'outer circumference.'" *Markman Order*, 2018 WL 3773986 at *6. It is therefore

such explanation, we cannot determine with confidence based on the factual record before us whether there are any genuine issues of material fact regarding infringement.

Accordingly, we vacate the district court's grant of summary judgment that the accused products infringed the '088 patent. Consistent with the claim construction, the court on remand should first identify, for the accused products, the outer circumference of the ring. That is, it must identify the ring's outer edge "that is curved[,] at least in part[,] and that generally encloses and reinforces an opening." *Markman Order*, 2018 WL 3773986, at *4 (footnote omitted). After identifying the complete outer circumference of the accused ring, the court should then identify what, if any, "projecting edge" projects from, i.e., off of that outer circumference of the accused ring. As explained above, Figures 18–20 and 31B provide clear examples of such a projecting edge while Figure 21 does not. In other words, the district court must fully explain how it found a projecting edge in the accused products and identify and explain where the "outer circumference" ends and the "projecting edge" begins.

## III. Unclean Hands

Marquis asserts that the district court erred in not considering its "unclean hands" argument. Marquis Opening Br. 55–56. According to Marquis, Focus acted with "unclean hands" because it filed a terminal disclaimer for the '088 patent after the district court issued its *Markman* ruling that destroyed the consonance necessary to overcome the nonstatutory double patenting rejection of the '088 patent. *Id.* at 53–55. Marquis asserts that Focus's strategic

---

far from clear as to why any portion of the accused ring's U-shaped perimeter edge, which appears to be the same as Figure 21's ring, is something other than the ring's "outer circumference."

delay in only filing the terminal disclaimer after succeeding on claim construction constitutes bad faith conduct. *Id.* at 55–56. We are not persuaded.

As an initial matter, this argument was not timely raised before the district court. Focus filed a terminal disclaimer on September 29, 2017, but Marquis did not raise this issue until the eve of trial in 2021. *See Post-trial Order,* 2023 WL3815276, at *6 (showing the district court's admonishment of Appellants for raising several defenses "at the brink of trial . . . including . . . unclean hands"); *see also* J.A. 3429. On the merits, to prevail on a claim of unclean hands, the accused infringer must prove that the patentee acted with the specific intent to deceive the PTO and the courts. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (en banc). Marquis does not allege any specific intent before the district court or on appeal. *See* Marquis Opening Br. 53–56; Marquis Reply Br. 21–23. Accordingly, the district court reasonably found that Appellants "do not allege that Focus acted with specific intent to deceive the USPTO." J.A. 3683–84 at 25:25–26:2. We therefore affirm the district court's decision.

## IV. HOOKLESS® Mark

Kartri argues that the district court erred in its "likelihood of confusion" analysis because it improperly determined whether Kartri's *product* would be confused for *products* sold under the registered HOOKLESS® mark. Kartri Opening Br. 42–43. Kartri contends this was erroneous, and that the correct trademark infringement inquiry is whether Kartri's use of the *term* "hookless" itself created a likelihood of confusion with Appellee's HOOKLESS® *mark. Id.* at 43; *see Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 383 (2d Cir. 2005). According to Kartri, it occasionally used the term "hookless," as it was understood in the marketplace, to describe its hook-free shower curtain, and not as an indicator of source. Kartri

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.          29
KARTRI SALES CO., INC.

Opening Br. 41–43. We agree with Kartri that the district court erred in its "likelihood of confusion" analysis.

To determine the likelihood of confusion, the Second Circuit applies the eight-factor *Polaroid* balancing test. *Star Indus.,* 412 F.3d at 384. The eight factors consider: "(1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Id.* (citing *Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 494 (2d Cir. 1961)). The analysis is not mechanical, but "focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." *Id.*

Although there is evidence in the record to support actual confusion between the HOOKLESS® mark and Kartri's use of the "hookless" term in marketing its product, the district court's "similarity of the marks" analysis erroneously relied on a comparison between the parties' products. *See Bench Trial Order,* 647 F. Supp. 3d at 188–89 (showing the district court relying on emails containing the "hookless" term as evidence of "the strong similarity between plaintiffs' and defendants' *products*" (emphasis added)). But under the Lanham Act, courts are required "to analyze the similarity of the products *in light of the way in which the marks are actually displayed* in their purchasing context." *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir. 2005) (emphasis added); *see also* 15 U.S.C. § 1052(d). Nothing in the record indicates that the district court conducted a detailed comparison between the HOOKLESS® mark and Kartri's Ezy Hang mark as branded on the parties' respective products, or whether the court considered Kartri's

30          FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.
                                        KARTRI SALES CO., INC.

occasional usage of the term "hookless" as itself a confusingly similar mark. *See Bench Trial Order*, 647 F. Supp. 3d at 217–20. Without such comparison, we cannot evaluate the district court's analysis as to whether Kartri infringed Focus's HOOKLESS® mark. Accordingly, we vacate the HOOKLESS® mark infringement determination and remand to the district court to perform a more thorough mark-to-mark comparison.

## V. EZ ON Standing

Appellants argue Focus did not have standing to assert the "EZ ON" mark against Appellants because Focus did not own the mark on December 30, 2015, when the case was filed before the district court. Kartri Opening Br. 44; Marquis Opening Br. 56. Appellants contend the district court erred in finding that a 2012 licensing agreement between third-party Carnation Home Fashions, Inc. (Carnation) and Focus proved that Focus owned the mark prior to the lawsuit, when in fact Carnation was the owner of the EZ ON mark. According to Appellants, this is because the district court misread Section 4.2 of the 2012 agreement, which granted Carnation "the right to use the following trademark on the Licensed Products: 'EZ ON Shower Curtain,'" to mean that Focus, rather than Carnation, owned the EZ ON mark. J.A. 3415; Kartri Opening Br. 44–45; Marquis Opening Br. 56. Appellants assert this interpretation is erroneous, as Carnation did not transfer the EZ ON mark to Focus until September 27, 2021. *See* Kartri Opening Br. 45 (citing J.A. 3651–53); Marquis Opening Br. 56–57 (same). We agree with Appellants that Focus did not satisfy its burden to establish standing, because the only evidence Focus relies on—the 2012 licensing agreement—does not show that Focus owned the EZ ON mark at the relevant time. *See Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994); *Rajamin*, 757 F.3d at 84 ("The plaintiff bears the burden of establishing such standing.").

To establish standing to sue for trademark infringement under the Lanham Act, a plaintiff must show that it is the owner or a party with a protectable interest in the mark.  *See* 15 U.S.C. §§ 1114(1), 1125(a); 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §§ 27:20–21, 32:3, 32:12 (4th ed. 2008) (noting that standing to sue for trademark infringement under the Lanham Act extends to owners of registered and unregistered marks, and nonowners with a protectable interest in the mark); *see also Berni v. Int'l Gourmet Rests. of Am., Inc.*, 838 F.2d 642, 648 (2d Cir. 1988).

It is worth noting that Focus did not provide any direct proof of ownership of the EZ ON mark prior to December 30, 2015, through evidence of its use of that mark in commerce or a trademark registration.  The district court, however, determined that the 2012 Carnation Agreement unambiguously showed that A&A LLC, Focus's predecessor, either owned or was assigned ownership of the EZ ON mark.[11]  *See Bench Trial Order*, 647 F. Supp. 3d at 196–97.  It examined the Agreement's Section 1.6, which defined the "Licensed Products" as "shower curtains having integrated rings of the form depicted in Appendix A" and "any rings having a substantially similar appearance to that shown in Appendix A."  *Id.* at 197.  Comparing the shower curtain ring image in Appendix A to both the Carnation Agreement and the EZ ON mark as Carnation used it at the time, the district court concluded that they were "substantially similar."  *Id.*; *see also* J.A. 3425.  On that ground, the court inferred that Focus must have been the owner of the EZ ON mark in order to grant Carnation, under the license, the authority to sell the EZ ON shower curtain.  *Bench Trial Order*, 647 F. Supp. 3d at 197.  The district court erred.

---

[11]  For simplicity's sake, we will refer to the licensor as Focus.

The text of Section 1.6 does not establish Focus's ownership of the EZ ON mark, and the district court followed a flawed interpretive path to reach that conclusion. Under New York law, a contract should be "read as a whole" to "give effect to its general purpose" and "safeguard against adopting an interpretation that would render any individual provision superfluous." *Flynn v. McGraw Hill LLC*, 120 F.4th 1157, 1165–66 (2d Cir. 2024) (citations omitted). Courts must also refrain from construing provisions as conflicting when a reasonable harmonious interpretation is otherwise available. *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992). To the extent that the district court interpreted the EZ ON mark as falling within the scope of the "Licensed Products," that was error because the licensed products were identified as shower curtains with particular shower rings, not any mark. Moreover, Section 1.6 never refers to the EZ ON mark. *See* J.A. 3413–14. Importantly, the Carnation Agreement already has a separate section, Section 1.8, entitled "Licensed Trademarks." *See* J.A. 3414. In the "Licensed Trademarks" definition, the agreement identifies only one trademark to be licensed to Carnation: HOOKLESS®. *Id.* Accordingly, Section 1.6 offers no insight into whether Focus owned the EZ ON mark.

The district court also relied on Section 4.2 to show that Focus unambiguously owned the EZ ON mark in 2012. Section 4.2 states:

> As part of said sublicense, [Focus] hereby grants [Carnation] the right to use the following trademark on the Licensed Products: "EZ ON Shower Curtain"; and also may use the phrase "with patented HOOKLESS® technology" in small print (i.e. print up to a 16 point font, so long as such print is not more than 25% the size of the term "EZ ON Shower Curtain"). However, [Carnation] shall not use the trademark HOOKLESS® as a brand name for the Licensed Products.

J.A. 3415. The district court concluded that Section 4.2 shows that Focus owned the EZ ON mark because "[i]t would not have made sense for licensor [Focus] to grant Carnation the right to *use* the EZ[]ON mark on its shower curtain products if Carnation *owned* the [m]ark." *Bench Trial Order*, 647 F. Supp. 3d at 198 (emphases in original). We disagree.

Contrary to the district court's reasoning, Section 4.2 does not unambiguously show that Focus owned the EZ ON mark. Instead, it is equally plausible (and likely the better reading) that Focus, through Section 4.2, governed Carnation's licensed use of Focus's HOOKLESS® trademark in combination with Carnation's EZ ON mark on packaging for Carnation's shower curtains. That is so in light of the "Licensed Trademarks" definition in Section 1.8, which identifies "HOOKLESS" only as the trademark to be licensed by Focus. *See* J.A. 3414.

Finally, the district court alternatively found that a different section—Section 5.3—expressly transferred ownership of the EZ ON mark from Carnation to Focus before the start of this lawsuit. *Bench Trial Order*, 647 F. Supp. 3d at 199. Section 5.3 states:

> In the event that any intellectual property falling within the scope of Licensed Patents, Licensed Trademarks or Licensed Products is conceived, reduced to practice, or developed, or a patent or trademark application is filed for by [Carnation] during the Term of this Agreement, such additional intellectual property shall be assigned to [Focus], and deemed included within the scope of the present Agreement.

J.A. 3417. The district court determined that the EZ ON mark was "reduced to practice" between 2012 and the start of the district court lawsuit in December 2015. *Bench Trial Order*, 647 F. Supp. 3d at 199. Accordingly, the district court held that the EZ ON mark and its trademark

application were, per Section 5.3, "additional intellectual property" that Carnation was required to assign to Focus before the start of this lawsuit. *Id.* (footnote omitted). The district court erred.

The district does not explain how the EZ ON mark could have been "reduced to practice" between 2012 to 2015. *See id.* There is no caselaw discussing the reduction of practice of a trademark. In fact, the Lanham Act requires that a trademark be used in commerce in order to claim ownership and file suit. "Use in commerce" is not the same as "reduction to practice," which is a patent law term of art. *Compare Couture v. Playdom, Inc.*, 778 F.3d 1379, 1380–81 (Fed. Cir. 2015) (explaining that registration under the Lanham Act requires the "use in commerce" of a mark at the time of filing, which means "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark" (citation omitted)), *with Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998) (explaining that "reduction to practice" can be either "constructive," by filing a patent application, or "actual," by building the invention and showing it works for its intended purpose). In any event, the district court's reduction to practice finding conflicts with its own observation that "at the time" of the 2012 agreement, Carnation "used" the EZ ON mark. *Bench Trial Order*, 647 F. Supp. 3d at 197.

The only other provision in Section 5.3 that could effectuate a transfer of the EZ ON mark to Focus is the provision that discusses "trademark application . . . filed for by [Carnation] during the Term of this Agreement." J.A. 3417. This provision, however, would not transfer the EZ ON mark to Focus in time to save its standing in this lawsuit. The earliest that the EZ ON mark could have transferred under this provision is when it was registered in September 2017, about two years after the lawsuit was

filed.[12]  More importantly, the EZ ON mark was not transferred by Carnation to Focus until September 2021.  *See* J.A. 3651.  This means that when the case was filed in December 2015, Focus did not have ownership of the EZ ON mark, and thus did not have standing to sue for trademark infringement related to that mark.

We therefore hold that Focus did not meet its burden to establish standing to sue Appellants for trademark infringement of the EZ ON mark.[13]  Accordingly, we reverse the district court's infringement determination relating to the EZ ON mark.

## VI.  Trade Dress

Focus claims that it has unregistered trade dress rights in the overall appearance of shower curtains sold under the HOOKLESS® and EZ ON brands.  *Bench Trial Order*, 647 F. Supp. 3d at 173.  The trade dress requires various aesthetics for a shower curtain, including: a "neat" and "orderly" upper edge; a ring bottom surface which is coplanar with the curtain material; and rings which are fixed in place and have slits.  *Id.*  As the plaintiff asserting infringement of an unregistered trade dress, Focus bears the burden of proving nonfunctionality.  15 U.S.C. § 1125(a)(3).

Appellants rely on *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29–30, 32–34 (2001), and Focus's expired utility patent[14] to argue that the asserted trade dress is functional, and thus unprotectable.  Kartri Opening Br. 50–51; Marquis Opening Br. 58.  In particular, Kartri argues the ring-and-slit configuration described in

---

[12] The trademark application was filed on March 3, 2017, long after the lawsuit was filed.  *See* J.A. 251.

[13]  The district court did not determine whether Focus had standing as a party with a protectable interest in the mark.

[14]  U.S. Patent No. 5,186,232 ('232 patent).

Focus's trade dress is "'essential to the use or purpose' of hanging a hookless curtain[] and also plainly 'affects the . . . quality of the device.'" Kartri Opening Br. 50 (omission in original) (quoting *TrafFix*, 532 U.S. at 33); *see also* Marquis Opening Br. 58. Appellants also contend the trade dress is invalid because it comprises the subject matter of the expired '232 utility patent. Kartri Opening Br. 52; Marquis Opening Br. 58–59. In their view, "any attempted reservation or continuation . . . of the patent monopoly, after the patent expires, whatever the legal device employed, runs counter to the policy and purpose of the patent laws." Kartri Opening Br. 53 (omission in original) (emphasis removed) (quoting *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 256 (1945)); *see also* Marquis Opening Br. 59 (citing *Singer Mfg. Co. v. June Mfg. Co.*, 163 U.S. 169, 185 (1896)).

This view finds support in *TrafFix*, which held that a prior utility patent "is strong evidence" that an asserted trade dress is functional where the features of the trade dress are claimed in the patent. 532 U.S. at 29. Under this framework, "[w]here the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." *Id.* at 30. A feature is deemed functional if it is "(1) essential to the use or purpose of the article, or if it (2) affects the cost or quality of the article." *Sulzer Mixpac*, 988 F.3d at 182 (citation omitted). "Product features are essential when they are dictated by the functions to be performed by the article" and "[a] feature affects cost or quality when it permits the article to be manufactured at a lower cost or constitutes an improvement in the operation of the goods." *Id.* (cleaned up) (citation omitted).

In determining that the trade dress was not functional, the district court accepted Focus's view that the asserted trade dress "gives rise to the visual appearance of an

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.     37
KARTRI SALES CO., INC.

essentially neat and orderly shower curtain." J.A. 124 (cleaned up) (citation omitted). The district court then found that "a neat and orderly appearance is in no way essential to the functional purposes of a shower curtain: protecting privacy and preventing water from spraying outside the shower area." J.A. 125 (cleaned up). Additionally, the district court determined that there is an "alternative design—e.g., one involving hooks—[that] could certainly perform the same functions."[15] *Id.* (citation omitted). Finally, the district court faulted the defendants for failing to show that the trade dress "is essential to the use or purpose of the device or [that] it affects the cost or quality of the device[.]" *Id.* at 126 (quoting *TrafFix*, 532 U.S. at 33).

The district court's functionality determination, however, ignored *TrafFix*'s instruction to compare whether "the expired patent claim[s] the features [of the trade dress] in question." 532 U.S. at 30. Indeed, the district court readily accepted the plaintiffs' contention that the trade dress created a "neat and orderly" shower curtain, without comparing the elements of the claimed trade dress to the utility patent claims.[16] *See* J.A. 124–126; *Bench*

---

[15] However, alternative designs do not preclude a functionality finding where the features of the trade dress are claimed in the utility patent. *See TrafFix*, 532 U.S. at 32–34.

[16] Claim 20 of the expired '232 patent, for example, could be read to claim the features of the trade dress in question. In particular, it claimed an "accessory" that "can be deformed to . . . be mounted onto and detached from said rod-like member while maintaining the shape of the defined openings sufficiently to retain said accessory on said rod-like member when said accessory is moved on said rod-like member to draw said openings closer together and

*Trial Order*, 647 F. Supp. 3d at 203–04, 206–09. This renders the district court's analysis incomplete regarding whether Focus met its burden of showing that its unregistered trade dress is not functional. *See* 15 U.S.C. § 1125(a)(3).

Accordingly, we vacate the district court's trade dress infringement holding and remand to the court to apply *TrafFix* in determining whether the trade dress is functional.

## VII. Waiver

Kartri and Marquis filed noncompliant briefs that divided the issues on appeal and attempted to incorporate by reference each other's briefs. *See* ECF No. 25 at 19 (Kartri); ECF No. 26 at 15, 17, 32 (Marquis). Kartri's brief focused on the trademark and trade dress issues, while Marquis's brief concentrated on the patent claim construction and infringement issues. After Appellees objected to Appellants' filings, ECF No. 33, we struck the non-compliant briefs and ordered Appellants to file corrected opening briefs, ECF No. 43 at 2, which did little more than delete their respective incorporation-by-reference statements. When it

---

move them further apart from each other." '232 patent, claim 20. When Focus tried registering its trade dress, the examining attorney rejected Focus's application for being functional, finding that the '232 patent "claims the design features at issue." U.S. Trademark Application Serial No. 98/114,472, Apr. 8, 2024 Non-Final Action (filed Aug. 2, 2023). Focus responded by citing to the district court's findings at issue here and requested a suspension of its application. *See id.* at Oct. 8, 2024 Response to Office Action. The examiner noted Focus's response, maintained its functionality rejection, and suspended the application pending the outcome of this litigation. *Id.* at Oct. 22, 2024 Suspension Notice.

FOCUS PRODUCTS GROUP INTERNATIONAL, LLC v.                    39
KARTRI SALES CO., INC.

appeared that Kartri and Marquis were continuing to seek the benefit from any successful argument made only by the co-appellant, we issued a show cause order directing Appellants to explain why their briefing strategy did not constitute another violation of our word count limit. *See* ECF No. 93 at 2–3.

Both Kartri and Marquis filed separate responses, stating that their individual opening briefs were designed to stand on their own and not incorporate any material from the other Appellant's brief, nor did they seek to benefit from successful arguments made by the other that they themselves did not adequately raise.[17] *See* ECF No. 95 at 5 (Kartri Resp. Show Cause); ECF No. 94 at 4 (Marquis Resp. Show Cause). In so doing, Appellants accepted the risk that they might have waived some of their underdeveloped arguments.[18] *See* ECF No. 95 at 7 (Kartri stating that

---

[17] Focus filed a motion for leave to file a response/reply. *See* ECF No. 96. We grant Focus's request to file a response and treat the motion as the responsive filing.

[18] Focus contends that Marquis and Kartri waived new arguments advanced for the first time on appeal. *See* Focus Resp. Br. 12–13. For example, Focus contends that Appellants did not object to the trade dress's functionality before the district court and cannot do so here. *See id.* at 30–31 (asserting that Appellants' attorneys merely submitted attorney argument that "trade dress can also be functional 'if the right to use it exclusively would put competitors at a significant non-reputational-related disadvantage'" (citing J.A. 125–126)). This contention, similar to Focus's numerous other waiver arguments, either mischaracterizes the record or Appellants' arguments both before the district court and on appeal. In Appellants' summary judgment briefing, for example, Appellants argued that Focus "must prove the matter sought to be

its briefings are self-contained and that it "has accepted [the] risk" of waiver of underdeveloped arguments); ECF No. 94 at 5–6 (Marquis acknowledging balance of "concise treatment" of complex issues and "risking waiver").

A close review of Appellants' briefings reveal that Kartri did waive its patent non-infringement arguments. Kartri spent less than one page on all patent issues, which, as shown above, are quite complex. Kartri Opening Br. 40–41. Kartri stated in a conclusory fashion that "Appellants' accused curtains featured D-shaped rings with a flat top, an angled slit, and no elements protruding from the ring." *Id.* at 40. It then string-cited several portions of the joint appendix without any clarification or explication. *Id.* at 40–41. Accordingly, Kartri waived its non-infringement argument on appeal. *See Medtronic, Inc. v. Teleflex Life Scis. Ltd.*, 86 F.4th 902, 906 (Fed. Cir. 2023) (holding that a party waived an argument by devoting only two sentences to it and attempting to incorporate materials from a brief filed in a different appeal); *Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1305 (Fed. Cir. 2021) (holding that "[a]n issue that is merely alluded to and not developed as an argument in a party's brief is deemed waived").

---

protected is not functional." J.A. 2433 (footnote omitted). Appellants further attempted to compare each element of the asserted trade dress with Focus's expired patent to show that the scope of the expired patent overlapped with the scope of the claimed trade dress. *Id.* at 2439–40. Then in their reply brief, Appellants discussed the asserted utility patents as "evidence of the functionality of the design, . . . [and argued that Focus] ha[s] made no effort to differentiate [its] trade dress elements from these patents." J.A. 2850. Even if Appellants did not cite *TrafFix*, we conclude they have sufficiently preserved their functionality arguments. We accordingly do not find Focus's waiver argument persuasive.

Marquis, on the other hand, did enough to preserve its arguments on the EZ ON standing and trade dress issues. With regard to the EZ ON standing argument, Marquis pointed to the 2012 Carnation Agreement as proof that Focus did not own the EZ ON mark when the case was filed in 2015. Marquis Opening Br. 56. Marquis also discussed Carnation's registration of the EZ ON mark in 2017, *id.* (citing J.A. 815), and the subsequent transfer of the mark from Carnation to Focus in 2021, *id.* at 57 (citing J.A. 3651–53).

Similarly, Marquis preserved its trade dress infringement argument by citing *TrafFix*, 532 U.S. at 29–30 and disputing the district court's functionality holding. Marquis Opening Br. 58. Marquis argued that the court should not have granted summary judgment of non-functionality "despite strong evidence from a utility patent." *Id.* (citing J.A. 125–26). Marquis then asserted that the utility patent covers the same subject matter as the asserted trade dress and cited *Singer*, 163 U.S. at 185, for the proposition that a patentee may not preserve its patent monopoly after the patent expired through the use of trademark law. Marquis Opening Br. 59.

Accordingly, for both Kartri and Marquis, we vacate the trade dress infringement finding and reverse the EZ ON trademark infringement finding. For Marquis alone, we additionally vacate the '088 patent infringement finding and reverse the '248 and '609 patent infringement findings. For Kartri alone, we additionally vacate the HOOKLESS® trademark infringement finding and affirm the '248, '609, and '088 patent infringement findings.[19]

---

[19] It is unclear on the record before us to what extent the patent damages verdict should be disturbed in light of our ruling today that Marquis is not liable for patent

## VIII.  Willfulness

Kartri contends the district court erred by finding willful infringement of the asserted patents, as well as the trade dress, based exclusively on the February 27, 2015 cease-and-desist letter, which gave notice only of Focus's purported patent rights and not its trade dress rights.  Kartri Opening Br. 55.  Additionally, Kartri argues that it made reasonable, good-faith efforts to determine the validity of the trademarks and patents that were being asserted against it.  *Id.* at 55–56.  Kartri asserts that it consistently and reasonably maintained that its products do not infringe the patents and trade dress, and it ceased manufacturing and selling the accused products once the district court issued its claim construction ruling in August 2018.  *Id.* at 55–57.  We agree with Kartri that the district court erred in finding willful infringement of the asserted patents and trade dress.

Given our ruling above vacating the district court's trade dress infringement finding, we must also vacate the district court's finding that Appellants willfully infringed Focus's unregistered trade dress.  Additionally, to the extent the district court found that Appellants' receipt of the cease-and-desist letter marked the beginning of Appellants' willful trade dress infringement, *see Bench Trial Order*, 647 F. Supp. 3d at 260–64, the district court erred because it is undisputed that Appellants were not put on notice of the trade dress infringement until over a year later on March 2016, *id.* at 192 (discussing amended complaint alleging trade dress infringement).

---

infringement.  On remand, the district court should consider whether a new patent damages trial is required to properly apportion the damages between Marquis and Kartri and between the asserted patents.

Similarly, the district court erred in finding that Kartri willfully and deliberately infringed Focus's patents and acted in bad faith by continuing to sell the purportedly infringing products until November 12, 2018, more than three months after the district court issued its *Markman* ruling. *See id.* at 264. The district court found that Kartri acted in bad faith because "[t]here is no evidence that [Kartri's co-owner and president] received, let alone, reasonably relied upon, advice of counsel to the effect that it was lawful to market Ezy Hang." *Id.* at 263; *see also* J.A. 205. In so doing, however, the district court ignored Kartri's consistent conduct during this litigation. The record shows that Kartri, through its counsel, has always "maintained that[,] under the claim constructions required in light of the histories of the asserted patents, the asserted patents were not infringed." Kartri Opening Br. 57 (citing J.A. 1901–02). For example, Kartri contended that it "reasonably believed that cancelation of all claims directed to curtains with flat-topped rings during prosecution of the '248 [p]atent meant that [Kartri's] products, which had flat-topped rings, did not infringe that patent." *Id.* The district court even acknowledged that Kartri conferred with its counsel following receipt of the cease-and-desist letter and "came away with the understanding that [it was] complying with the law." *Id.* at 56 (quoting *Bench Trial Order*, 647 F. Supp. 3d at 263 n.89).

Accordingly, we vacate the district court's willfulness determination with regards to both patent and trade dress. On remand, the court should determine if Kartri's belief was reasonable in light of our reversal of the '248 and '609 infringement determinations and our vacatur of the '088 infringement ruling for Marquis. Given our rulings of non-infringement *supra*, Discussion Section II.A–B, we reverse the district court's finding of willfulness for Marquis as to the '248 and '609 patents, but vacate the willfulness finding as to the '088 patent. On remand, if the district court finds infringement of the '088 patent, it should also determine if

Marquis's belief of noninfringement was reasonable in light of our ruling.

## IX. Attorneys' Fees

Kartri argues the district court abused its discretion in awarding attorneys' fees, both by incorrectly finding the case exceptional and by including fees that are untethered to the litigation. Kartri Opening Br. 57–58. Kartri asserts the district court erred in evaluating the strength of Focus's litigation position instead of evaluating the strength of Appellants' position. *Id.* at 59 (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 545–46 (2014)). According to Kartri, Appellants' litigation positions before the district court were not "exceptionally meritless," as several of their positions were validated in other proceedings. *Id.* (citing *In re Zahner Design Grp., Ltd.*, No. 2022-1026, 2022 WL 2525340 (Fed. Cir. July 7, 2022), *aff'g Ex Parte Zahner Design Grp., Ltd. Pat. Owner & Appellant*, No. 2021-1988, 2021 WL 3726157, at *7 (P.T.A.B. Aug. 19, 2021)). Additionally, Kartri contends that the district court's reliance on a laundry list of litigation deficiencies does not rise to the level of "vexatious litigation strategy" described in our caselaw. *Id.* at 60–61; *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1367–69 (Fed. Cir. 2013). Finally, Kartri argues that the district court's decision to award attorneys' fees was punitive rather than compensatory, aimed at reaching a figure that would "deter unreasonable litigation conduct." Kartri Opening Br. 61 (quoting J.A. 400–02). Kartri also contends that some of the awarded fees are not supported by the record. *Id.* at 61–62. In particular, Kartri asserts that Focus's counsel's invoices for work done in 2015–2016 lack sufficient detail for the court to determine the nature of the services performed. *Id.* at 62–63.

The district court did not abuse its discretion when it deemed this case exceptional. The court pointed to various instances where Kartri provided false sales data at trial;

where Marquis chose not to conduct a patent analysis for a relatively small fee; where both Appellants routinely flouted court orders; and where Appellants advanced baseless claims without support. *Post-trial Order,* 2023 WL 3815276, at *3–9. The district court's attorneys' fees determination, however, does not distinguish between work on patent infringement versus work on trademark infringement. *See id.* at *9–14. Because we vacated and reversed a part of the district court's infringement determination, it is necessary to recalculate the sum of attorneys' fees to correctly apportion fees related to work where Focus still maintains prevailing party status.

Accordingly, we vacate the district court's attorneys' fees award. On remand, the district court should recalculate the total attorneys' fees for work where Focus remains the prevailing party. *See B.E. Tech., L.L.C. v. Facebook, Inc.*, 940 F.3d 675, 677–78 (Fed. Cir. 2019) (discussing definition of a prevailing party).

## CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. We therefore affirm in part, reverse in part, vacate in part, and remand for a new trial consistent with this opinion.

**AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED**

### COSTS

No costs.